## ANNIE S. WILLIAMS V. THE STATE.

### No. 1665. Decided May 17, 1899.

**1. Continuance—Admissions to Avoid.**

In order to avoid a continuance, the truth of the facts stated in the application must be admitted. But where, in addition to such admission, the application sets out the testimony of the absent witness taken on another trial, and from which it is apparently doubtful if defendant would ever have introduced him as a witness if present, and there is no suggestion that his testimony would be different, which could easily have been shown in this case, had such been the fact; Held, the continuance was properly refused.

**2. Murder—Evidence.**

On a trial for murder, which was brought about by an alleged libelous newspaper article, it was admissible to introduce testimony to show the circumstances connected with the publication as furnishing the basis for it, and what defendant may have said about it.

**3. Same—Acts and Declarations of a Coconspirator—Res Gestae.**

On a trial for murder, even if a conspiracy to commit the offense be shown, the declarations of one coconspirator, after the accomplishment of the object of the conspiracy, is not admissible as evidence against the other. And where such declarations are not contemporaneous with the main fact, but are only a narrative of a past act by one of the coconspirators, it is not relevant as part of the res gestae of the homicide.

**4. Same.**

A confession made by one after a conspiracy has ended can only be received as evidence against the one making the confession, and not against his associates.

**5. Silence as Admission or Confession.**

The mere silence of a party, when a statement is made in his presence and hearing, can not be construed as such an indorsement or admission as to authorize its introduction in evidence against him, where, under the circumstances, he was not required to speak.

**6. Murder—Evidence as to a Libelous Newspaper Article.**

On a trial for murder, which was occasioned by an alleged libelous article, which appeared as an editorial in a newspaper of which deceased was one of the publishers, after defendant introduced said article doubtless for the purpose of raising the issue of manslaughter, it was error, over the objections of defendant, in disparagement of such defense, to permit proof going to show that deceased was not in fact the author of the article, there being nothing to show that defendant, who regarded him as responsible, did not know that he was not the author.

**7. Same—Dying Declarations.**

Under the circumstances stated in the foregoing paragraph, it was also error to admit in evidence a portion of the deceased's dying declarations to the effect, "I did not write the article which gave offense."

**8. Same.**

A dying declaration to the effect, "When they came into the office I treated them perfectly gentlemanly; they added insult to insult," is inadmissible upon the ground that it was not the statement of a fact, but a conclusion of the declarant.

**9. Wife as Witness—Cross-Examination—Privileged Communication.**

Evidence as to privileged communications between husband and wife is inadmissible. Code Crim. Proc., art. 774. And, upon cross-examination of a wife as a witness, she can not be examined as to any matter which is not shown to have been pertinent or germane to her examination in chief.

**10. Manslaughter—Charge.**

On the trial of a wife for the murder of a newspaper editor, on account of the publication of libelous matter concerning her and her husband, and where her husband was also directly implicated as a party to the killing, the charge of the court is erroneous which submits the issue of manslaughter only as predicated upon a killing by the wife, especially where there was testimony tending to show that the killing was done by the husband, and that he was instigated by the libelous article. A charge upon manslaughter should also have been predicated upon this phase of the case.

**11. Murder—Principals—Charge.**

On the trial of a wife for murder, where the evidence tends to show that her husband, who was present, may have done the killing, the charge of the court was erroneous which nowhere gave the defendant the benefit of the doctrine of principals as applied to a killing by the husband.

APPEAL from the District Court of Erath. Tried below before Hon. J. S. STRAUGHAN.

Appeal from a conviction for murder in the second degree; penalty, twenty years imprisonment in the penitentiary.

This is a companion case to Williams v. State, ante, p. 497, and the main facts will be found reported in that case.

*Daniel & Keith* and *Martin & George,* for appellant.

*W. J. & Eli Oxford* and *Robt. A. John,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and her punishment assessed at confinement in the penitentiary for a term of twenty years; hence this appeal.

This is a companion case to cause No. 1656 (Williams v. State, ante, p. 497), and the statement of facts is substantially the same in both cases. In the former case, however, Harry Williams was a witness, while in this case he did not testify, but his wife, Annie S. Williams, was a witness in her own behalf. She testified in this case in effect: That she and her husband were informed of the article in the Erath Appeal on Saturday, while they were in the country. That when they came home that night they saw the article about supper time. After supper she and her husband and son, Frank Heizer, got in the buggy and went to the house of one Moore, who was the editor of the Empire, another paper in town, and there they talked with him in regard to the said publication. That from there they returned home, and remained at home during Sunday. That on Monday morning she and her husband and son Frank got in the buggy and went downtown. That she carried her husband's dirk knife with her. That her husband attempted to get a pistol at the courthouse. That while he was in the courthouse she went to a store and bought a buggy whip. That she and her son then returned to the courthouse, and her husband came out and got in the buggy, and they drove to the office of King & Hibdon. That she had made up her mind, before she went down there, to horsewhip the man who had written the article in the paper. That she carried the dirk knife along for protection. That they went up to the office of King & Hibdon, and no one was there, and they sent for King. When he came in, Mr. Williams asked him if he was the editor of the Erath Appeal, and he said he was. Williams then asked him if he was responsible for the article in the paper, and he said he was. Williams them asked him if he knew how that article read, and he said he did. Her husband then told him that the article was a lie from beginning to end. King said: "Hold on, Williams. I have good authority for that article." That she asked King who was his authority, and he said, "Snapp." Williams then said to King, "Don't you know that you have put the negro at the head of this thing, and that you slandered my wife?" and then asked him if he knew what "proboscis" meant, and deceased said he did,—that it was the fore part of the face. Williams then said: "It is no such thing. It is the snout of an elephant." She then asked King if he had ever seen her before, and he said, "No," and then said to King, "What do you know about my face and complexion and my form?" King said, "What in the hell have you got to do with it?" and she then said, "I will show you." "I then reached back and picked up the whip, and King jumped at me, struck me two licks, one on each side of the forehead, and King said as he struck me, 'No, God damn it! you won't. I will kill you first.'" That, when he struck her on the head with his fist, he knocked her bonnet down over her face, and grabbed her by the arm above the left elbow. He gave her arm a fearful wrench, and pushed her out of the door. Her bonnet was still down over her face, and he had her by

the left arm; and he hurt her so by twisting her arm that she took the knife she had in her left hand with her right hand and cut at him, but did not know that she hit him, as she could not see what she did. She was so mad, and he hurt her so, that "I cut him for the purpose of getting him loose from me." About this time Williams and King became engaged, and were knocking at each other; and Sam Russell and Charley Wilson came running in and separated them. She further said that she intended to horsewhip King, if he said he wrote the article in question, and to do whatever was necessary to make him take it, but that she did not intend to kill him. For other testimony, we refer to the opinion in Williams v. State, supra.

The first question presented is as to the action of the court in overruling appellant's motion for continuance. Appellant made an application, setting up that she could prove certain facts by one Russell, who, it was shown, had been properly subpoenaed, but was unable to attend, on account of sickness. In reply to this, the State set up the testimony of said witness Russell in the examining trial, and offered to admit the truth thereof. This examining trial evidence, in addition to the facts stated in appellant's application, contained other facts testified to by said witness more or less damaging to appellant. It was further developed, as shown by the court's explanation, that on a former day of the same term a motion for continuance, predicated on the absence of this same witness, was filed, which contained, as an exhibit, the whole of the examining trial evidence. It is insisted by the State that this was a sufficient answer to the application for continuance. On the other hand, appellant contends that it was no answer; that the authorities all show that, in order to cut off the motion for continuance, the truth of the facts stated in the application must be admitted. This is true, as a general proposition; but, under the peculiar facts of this case, it occurs to us that the application was here made for delay merely, and that, if said witness had been present it is doubtful if appellant would have introduced him, should the State have failed to bring him forward as a witness. There is no suggestion here made that his testimony would be different from that rendered by him on a former trial of the case. If such was the case, it was entirely feasible for the defendant to have taken his affidavit to that effect, as said witness was accessible, being sick in the town where the trial took place.

In our opinion the testimony of Mrs. Altman and Tish Adams was admissible. The difficulty evidently occurred about the alleged libelous publication contained in the Appeal, and it was admissible to show the facts and circumstances connected with said publication, as furnishing the basis thereof, and to show what appellant may have said about it. See the question discussed in Williams v. State, ante, p. 497.

The State introduced John Lockhart, who testified that, shortly after the stabbing of King, and while defendant and Harry Williams were coming downstairs from the office of deceased, and just as he struck the sidewalk in the presence of the officer who had him in charge, witness Lockhart said to the party who had hold of deceased to lay him down, so

the blood would run out of him, and that Harry Williams replied to that, and said: "Yes, God damn him! lay him out. That is what I aimed to do, and there are five or six others in this town that I will do the same way if I get the chance." This testimony was objected to on the ground that it was irrelevant and immaterial, after the commission of the offense, and not assented to by defendant Annie S. Williams, and was calculated to injure the rights of the defendant. The court, in admitting this testimony, explains "that this statement of Harry Williams was made within about two minutes after the difficulty; that it was made within a few steps and within view of the deceased, and that the defendant was present and had hold of Harry Williams' arm at the time." Under the circumstances of this case we do not regard this as res gestae, as against appellant. Concede that the testimony shows that she and her husband had entered into a conspiracy to take the life of deceased; the purpose and object of this conspiracy had been accomplished. So it can not be said that this declaration was made pending the conspiracy, and in furtherance of the common design. It was the act of one of the conspirators made after the accomplishment of the object of the conspiracy. This might be evidence against Williams, the party making it, as a confession or admission, and could only be used against him. What Williams said was not contemporaneous with the act of stabbing deceased, and was not illustrative of that transaction. It was the narration of a past act by one of the coconspirators, and is not relevant, as forming a part of the res gestae of the homicide itself. See People v. Davis, 56 N. Y., 95; Heine v. Com., 91 Pa. St., 145; State v. Larkin, 49 N. H., 39. The authorities all teach that the confessions made by one after the conspiracy has ended can only be received as evidence against the one making the confession, and not against his associates. See Com. v. Ingraham, 7 Gray, 46; State v. Arnold, 48 Iowa, 566; People v. Arnold, 46 Mich., 268, 9 N. W. Rep., 406; People v. Aleck, 61 Cal., 137. If we analyze the language used in the declaration attributed to Williams, the only part of it that referred to the homicide is the statement that he did it. That, taken by itself, would not damage appellant. But the other expressions, showing his individual animus, if admissible, as affecting her, might prove quite prejudicial. There is no testimony that she in anywise assented to this, and her silence can not be construed as such indorsement, when she was not required to speak, as to authorize its introduction as evidence against her. This testimony was improperly admitted.

The State was permitted to prove by John Hibdon that Frank Leonard wrote the article in the Appeal about which the difficulty occurred; that King did not know of his writing it, and had nothing to do with it, and, so far as the witness knew, he never knew of its contents until after the paper was published. This testimony was objected to on the ground that the proof showed that deceased was one of the publishers of said paper, and the State could not be heard to say that he did not write it and was not responsible for the same, because the law made the same his article, so far as the rights of the defendant were concerned, the article having

appeared in his paper as an editorial. The article in question, which was offered in evidence by appellant, was doubtless introduced for the purpose of raising the issue of manslaughter, and was also admissible for the purpose of suggesting murder in the second degree, and in mitigation of the punishment therefor. If said article be libelous in its terms of appellant and his wife, then the fact that deceased was either the author or publisher and circulator, it occurs to us, would have the same effect; and we fail to see how its purpose, so far as appellant was concerned, could be lessened or diminished as to her by showing that deceased did not in fact write the article. But evidently it was the object of the State by this testimony to depreciate or disparage her defense of manslaughter by allowing it to be shown that deceased was not in fact the author of the article. There is nothing in the bill, nor, if we refer to the testimony, is there anything in it, to show that she knew he was not the author of the article. On the contrary, the testimony tends to show that she regarded him as responsible for the article. We are of opinion that this testimony should not have been admitted. And the same observations above made are also applicable to that portion of deceased's dying declarations wherein he says, "I did not write the article which gave offense."

Appellant further objected to that portion of the dying declaration of deceased as follows: "When they came into the office I treated them perfectly gentlemanly. They added insult after insult." Appellant objected to this on the ground that it was not the statement of any fact, but a conclusion of the witness. We concur in this view. See the question dicussed in Williams v. State, supra. When Mrs. Williams was on the stand the State was permitted to prove by her that her husband told her on Sunday that he was going to get a pistol Monday. This was objected to by defendant because the same elicited a private and privileged communication between the husband and wife, and was calculated to prejudice the rights of defendant. It was not shown that this was pertinent or germane to the examination of the witness in chief, so as to authorize the State to bring it out in cross-examination. Standing isolated, it would appear that this was a privileged communication between the husband and wife, and should have been excluded, under article 774, Code of Criminal Procedure.

Appellant also excepted to the court's charge on manslaughter, and to the refusal of the court to give her requested charge on that subject. We have examined the court's charge carefully on this subject, and find that it only submitted to the jury manslaughter predicated on a killing by appellant herself. Said charge submits an assault on her by deceased as adequate cause, and further submits that if she sought deceased, not for the purpose of killing or inflicting serious bodily injury, and, in the conflict which ensued, deceased attacked her in such manner as to cause her to apprehend death or serious bodily injury, and she formed the intent to kill under passion so excited, in such event she would be guilty of manslaughter. The court gave no charge predicated on the killing by Williams, the husband of appellant, nor did he give any charge predicated on

the alleged libelous article. It is true that appellant, by her own testimony, shows that she stabbed deceased, yet the jury may not have believed her statement; and there is testimony in the record on the part of the State indicating that Williams, her husband, did the stabbing. Now, if Williams committed the act which caused deceased's death, and he was instigated thereto on account of the libelous article, or on other accounts suggested in the record as adequate cause to create passion, and the killing by him was under circumstances requiring a charge on manslaughter, certainly his wife should have had the benefit of a charge presenting that view of the case. The court, in its charge, defines who are principals, but it nowhere gave appellant the benefit of the doctrine of principals, as applied to a killing by appellant's husband. Moreover, the effect of the court's charge in singling out certain circumstances as adequate cause to reduce the offense to manslaughter, in omitting to instruct the jury in that connection in regard to the alleged libelous article and its influence on appellant's mind, was calculated to wholly deprive her of the benefit of passion excited in her mind on that account; and, in our view of the case, she should have had the benefit of such an instruction. The charge asked, in our opinion, remedied the defects complained of, and was a proper charge, and should have been given. For the errors pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*