## John Coffman v. The State.

### No. 3497. Decided May 22, 1907.

**1.—Murder in Second Degree—Bill of Exceptions—Stenographic Report.**

Upon appeal from a conviction of murder in second degree, where the bill of exceptions taken in the stenographic report, to the ruling of the court in not permitting the son of defendant to testify why he left his wife, did not state distinctly the testimony which he proposed to introduce, the same could not be reviewed.

**2.—Same—Evidence—Bill of Exceptions.**

Where appellant's bill of exceptions did not show what his witness would have testified to, nor give any reason why such testimony should have been admitted, the same could not be reviewed.

**3.—Same—Evidence—Animus of Witness.**

Upon trial for murder, there was no error in rejecting testimony to the effect that the prosecuting witness came to the courthouse armed with two revolvers, etc. to attack defendant, or that the son of the prosecuting witness and deceased at a picnic during the summer preceding the trial had an altercation; it

not having been shown that the State's witnesses denied ill feeling towards the defendant.

#### 4.—Same—Evidence—Identity—Opinion of Witness.

Upon trial for murder, there was no error to permit a witness to state her opinion as to whom she saw riding a certain mule on the day preceding the homicide near the scene of the same.

#### 5.—Same—Evidence—Codefendant as Witness.

A codefendant who was indicted for the same offense as defendant for murder, and had not been tried was not a competent witness for defendant.

#### 6.—Same—Newly Discovered Evidence.

Where upon motion for new trial, the record showed that the alleged newly discovered evidence was not germane, and that the witness by whom it was proposed to be given had been placed on the witness stand by the defendant during the trial and was thoroughly examined, there was no error in overruling the motion.

#### 7.—Same—Measurements and Views Taken of the Ground Near Homicide.

Upon motion for new trial after conviction of murder in the second degree, there was no error in overruling the same, as the testimony consisting of measurements and views taken on the ground with reference to distance and intervening objects, etc., did not constitute newly discovered evidence, nor was the same of sufficient importance.

#### 8.—Same—Charge of Court—Principals.

Where upon trial for murder the evidence although circumstantial showed that defendant was present at the time of the homicide, either keeping watch or doing some act to aid in the killing, the court correctly charged on the law of principals.

#### 9.—Circumstantial Evidence—Charge of Court.

Where upon trial for murder the charge of the court after stating the rule as to circumstantial evidence required the jury to believe that the accused and no other person, unless it was the codefendant did the killing and that defendant acted together with him if he did the killing, there was no error.

#### 10.—Same—Charge of Court—Alibi.

Upon trial for murder the court's charge on alibi sufficiently safeguarded defendant's rights, that being his main defense.

Appeal from the District Court of Marion. Tried below before the Hon. P. A. Turner.

Appeal from a conviction of murder in the second degree; penalty, twenty years imprisonment in the penitentiary.

The charge on alibi was in the usual form.

The opinion states the case.

*L. L. Schluter* and *T. D. Rowell,* for appellant.—On question of rejecting testimony to show reason why son of defendant left his wife: Crockett v. State, 49 S. W. Rep., 392; Blanco v. State, 57 S. W. Rep., 828. On question of animus of witness: Mason v. State, 7 Texas Crim. App., 624; Watts v. State, 18 Texas Crim. App., 384; Lyle v. State, 21 Texas Crim. App., 154; Tow v. State, 22 Texas Crim. App., 184. On question of principals: Cole v. State, 40 Texas, 150; Davis v. State, 28 Texas Crim. App., 556. On question of newly discovered evidence: Lindley v. State, 11 Texas Crim. App., 287.

*F. J. McCord,* Assistant Attorney-General, and *Horace W. Vaughn,* for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at twenty years confinement in the penitentiary; and prosecutes this appeal.

This is a case of circumstantial evidence, the theory of the State being that Ben Coffman, appellant's son, committed the homicide by lying in wait for deceased Wilson, and that appellant was present at the time aiding and abetting in the homicide. The defendant relied on the weakness of the State's case, and also introduced evidence of an alibi.

A summary of the facts, on the part of the State, shows that the homicide occurred in the country some seven miles north of Jefferson in Marion County. Appellant, John Coffman, owned a farm, and lived with his family at the Coffman residence on his farm; his family consisted of himself, his son Ben Coffman, who was about 21 years of age, a younger son about 15 or 16 years old, named Bawney, and a daughter Fredonia, and another son, Warren, who was absent at the time in West Texas. On the farm south of appellant's place deceased J. S. Wilson lived with his family; he was a tenant of appellant, and had been since about the first of January, this homicide occurring on the 24th of March, 1905. Wilson's family consisted of himself, his wife, his son Billy Wilson, a daughter, named Susie Wilson, and a young daughter about 12 years old, named Pearl Wilson. About the 7th of March appellant's son Warren married deceased Wilson's daughter Madgie; they lived together at appellant's house about one week when Warren Coffman suddenly disappeared; his wife immediately returned to the deceased Wilson's home where she was residing at the time of the homicide. Up to the time of Warren's separation from his wife the relations of the families (appellant's and deceased's), appeared to have been friendly. The homicide itself seems to have grown out of this separation. There is some testimony from the State's witnesses tending to show that appellant made some remarks in regard to Mrs. Madgie Coffman, his son's wife, after Warren had left her, in the neighborhood; this appellant denied. Inasmuch as the State's case mainly depends on the locus of the homicide, and the situation of the various places connected therewith, a plot was introduced in evidence, a copy of which is here inserted:

On Thursday preceding the homicide, which occurred about noon on the following Saturday, it is shown that deceased and some of his children were working land tenanted by them across the branch from their house, and in the vicinity where John Coffman and his sons Ben and

Bawney and daughter Pearl were working their part of the farm.
About dinner time deceased quit work, his children went on to the
house, and he remained, and as John Coffman plowed out to the end
of the row, an altercation ensued between them at a point in the Coff-
man field, which is designated. Appellant's version of this is to the
effect that deceased charged appellant with being the cause of his son
Warren leaving his daughter, and he wanted to know where Warren
was, and said if he ever laid eyes on him he would fix him. During
the altercation deceased drew his pistol on John Coffman, and cursed
and abused him. Bawney and Ben came up and interfered,· Bawney
and John Coffman drawing their knives, as they stated, in self-defense.
Appellant insisted that he had nothing to do with the trouble, and tes-
tified that he told Wilson what he knew about it; that his boy had left
his daughter because she refused to be a wife to him. During this col-
loquy something was said about going down in the pasture to settle the
difficulty. The pasture is southwest of where this difficuluty occurred,
and is the locus of the homicide. According to appellant's statement
deceased made some threats against them on this occasion. The State's
theory on this point is that the altercation occurred between the parties
about the separation of Warren Coffman and deceased's daughter, but
in that the appellant was the aggressor, and on their parting he threat-
ened, before Saturday· night, that he would shoot deceased or burn
powder in him. John Coffman and Bawney Coffman drew knives on
deceased, and deceased drew his pistol to protect himself. On the fol-
lowing Saturday, somewhere about 10 o'clock, deceased Wilson left his
house with a single-barrel shot-gun, stating that he was going down
into the pasture west of his residence to see if he could kill some tur-
keys, and left going in that direction. In this connection, it may be
stated the evidence for the State tends to show that this is the only
occasion of his going turkey hunting. A short while after he left
four shots were heard by various neighbors down in the pasture in the
direction where deceased's body was subsequently found, some seven hun-
dred and fifty yards west of deceased's house; his body was not discovered
until about two hours afterwards. Somewhere about 12 o'clock de-
ceased's children, Billy and Pearl, who had been working out in the
field north of the house, came home,. and as deceased had not returned,
his wife requested her son to go and look for him. In a short time he
came back to the house and reported that he had found his father down
in the pasture, and brought his single-barrel shot-gun home, which ap-
peared to have been recently discharged; his mother at once told him to
take the gun back and place it by the body where he had found it, which
he did. A number of parties went upon the ground that evening, and
found signs of where some person had stood some thirty or forty feet
from the road or path-way where deceased's body was lying behind a
tree top, and there was found in the vicinity of where this party stood
the evidence of where a shot had been fired into the ground. It was
claimed by the State that this shot was not in line with deceased's body

toward where it was assumed the person stood who shot deceased, but about seven feet out of the line. Search was made for foot-prints, and a number of tracks were found near the body. These were traced from there north toward the branch and the Coffman residence, the testimony showing that they were the prints of a No. 8 or 9 shoe, and showed in places to have been made by a run-down shoe. Ben Coffman's shoes were identified, and there was testimony showing that the tracks were made by such shoes. The State also introduced testimony showing a mule track going and coming in the vicinity of the body; said mule track was traced up and around the southwest corner of the Wilson field; the fore-feet of the mule making the track were shod. It was shown in this connection that John Coffman had a mule that he usually rode, that the front feet of the mule were shod at that time. There was also discovered in the vicinity of the body, about six or eight feet therefrom, a knife, which was identified as the knife of Ben Coffman. Gun wads were found on the ground, and some sticking to the clothes of deceased; those sticking to the clothing came out of a 16-gauge gun, which the evidence shows was owned by Ben Coffman. Deceased's gun was a 12-gauge gun, and some wads were found on the ground from a 12-gauge gun. The evidence with reference to the shots showed that two shots were fired in rapid succession and after an interval two others were fired; some of the witnesses say both of the other shots sounded different from the first two, while some of the witnesses say one of them sounded different. A short time after the shooting Mrs. Anderson, who lived west of the pasture, about two or three hundred yards from the lane marked "Coffman Road," and which was about half way between her residence and the place of the homicide, states she heard the shots, heard some one halloo as if in pain, and a dog bark, and directly afterwards she saw a young man dressed in dark looking clothes with a gun on his shoulder going rapidly up the lane in the direction of the Coffman residence, accompanied by a dog, which she describes as a little dog, a dark looking dog with a ring around its neck belonging to Coffman. Her husband, Anderson, also testified that he heard the shooting, described the shots, heard the dog bark, and that he had subsequently heard the Coffman dog bark, and he was satisfied it was the same dog's bark that he heard at the place of the homicide. This witness was not immediately at the well with his wife, but was down in the field plowing. The officers procured the gun of Ben Coffman the same day or the next day after the homicide, and it was a 16-gauge gun and had been freshly discharged. This is substantially the State's testimony that connects Ben Coffman with the homicide; the circumstances tending most pointedly to connect appellant, John Coffman, with same was the evidence of Mrs. Anderson to the effect that a short time before the shooting, she thought an hour or more, she was out at her well, and looked across in the direction of the Coffman residence and saw in the vicinity of the seed-house a person coming down from the direction of the Coffman residence riding a mule, which she de-

described as like appellant and his mule; said person was coming down the road in the direction of the Coffman west gate, which leads into the lane between the James place and their place and the Coffman place; also the testimony of Mrs. Wilson, who stated a short time before the shooting she got a glimpse of some one riding a dark mule like that of appellant's down in the pasture around the corner of their fence. Appellant John Coffman was shown to have had such a mule; was shown to have been riding him that morning; the tracks of a mule shod before were found in the vicinity of the homicide. In addition the testimony of the two witnesses shows that a short time after the shots were fired, about thirty minutes, they were along near the road in the vicinity of the James residence, and they saw appellant riding the shod mule on the road leading from his residence toward the James residence, and from the general direction of where the homicide occurred. These witnesses place appellant's presence there after the shots were fired, which they testify they had previously heard they say about thirty minutes after the firing.

In answer to the State's case appellant introduced some evidence tending to show that Ben Coffman could not have committed the homicide; that his knife, which was found near the scene of the homicide, he had lost down there the preceding day while hunting, and that he left home on the morning of the homicide after assisting in loading some cane on a wagon about 10 o'clock, and went out north or northwest some six or eight miles to collect a debt, making the trip on foot. Also for appellant an alibi was proved by a number of witnesses to the effect that he left home before the shooting was heard in the neighborhood; that he stopped and talked at the James residence with Mrs. James before the shots were fired, and perhaps others saw him on the route to Jefferson before the shooting; he went to Jefferson that evening on the shod mule, going around by the James residence, and to the west of the Anderson farm, and was seen by various persons along that route and at Jackson's store, and subsequently some of the witnesses state he was in Jefferson about 11 o'clock. This is a sufficient statement of the case in order to discuss the assignments.

Appellant contends that the court committed an error in not allowing him to prove by the witness Warren Coffman the cause of his leaving his wife or the reason therefor. The bill of exceptions, which appellant claims presents this question, is to be found on page 338 of the record. It does not occur to us that this matter is in a condition to be reviewed, and is like bills of exception generally that are taken in stenographic reports. We note appellant was permitted to prove that he (witness) left his wife of his own free will. The question was then asked him if he had had any trouble. This was objected to; he was then asked if he was at home when the homicide occurred, or if he knew anything about the trouble that his father was charged with, to which he replied, "No, sir." He further replied that he was not in the county at the time. Then a colloquy ensued between counsel and the

court. Counsel asked the court if the court understood what appellant wanted to show in the bill of exceptions, to which the court replied, "Yes, sir." Counsel then said, "We there laid a predicate to show a different state of facts. With that understanding, don't want to have any misunderstanding as to the evidence." The court: "I sustain the objection, on the ground that it hasn't any connection with the case." The witness was then asked the question, "Don't know anything about the facts that led up to the trouble? A. No, sir." He was then asked, "You don't know anything about what took place while you were gone? A. No, sir; while I was gone I knew nothing." This is all we can make of any bill of exceptions. If counsel wanted to save any question as to what he wanted to prove by this witness, he should have stated distinctly either in this stenographic report, or in a separate bill, the testimony which he proposed to show by the witness, and have stated his reasons for desiring its admission. However, so far as appellant was concerned, by an examination of the record, the witness John Coffman, when he was on the stand, was permitted to testify that he told deceased Wilson the reason he understood why his son had left his daughter. If appellant had shown by bill of exceptions that he offered to prove this same character of testimony by Warren Coffman, a different question would be presented.

Appellant contends that the court erred in not permitting defendant to prove by the witness T. H. Stallcup that he had never told Mr. Wilson, the deceased, that Coffman, the defendant, had talked to him about his (Wilson's) daughter, or said anything wrong to him about her, as shown by bill of exceptions. On page 389 of the transcript, we find this colloquium with regard to the testimony of this witness, "Q. Do you know how long it had been since you had seen John Coffman before the killing? A. No, sir; I don't. Q. Did you ever tell Mr. Wilson?" The State cautioned the witness not to answer until the State should have an opportunity to object. "Q. Did you ever tell Mr. Wilson that Mr. Coffman had talked to you about his daughter, or said anything wrong about her? The State objected as immaterial; the objection was sustained; the defendant excepted." We observe about this so-called bill that it is not here shown what Stallcup would have testified to nor is any reason afforded us why said testimony should have been admitted. Certainly the character of the testimony proposed to be elicited should have been made known to the court in order that he may have ruled correctly on it, and that same would be in a shape to be reviewed by this court. It seems from appellant's brief that he desired to contradict Mrs. Wilson, wife of deceased; that Mrs. Wilson had previously testified that appellant had talked about her daughter; among others to the witness Stallcup, and that it was desired to contradict Mrs. Wilson by the witness Stallcup. An examination of the testimony of Mrs. Wilson shows that appellant drew this testimony out of Mrs. Wilson, and as to this matter, it would seem she was appellant's own witness. See page 90 of the stenographer's report.

Appellant complains that he was not permitted to show that deceased's son, Billy Wilson, assaulted and shot him sometime after the homicide, and also that Mrs. Wilson had come to the court-room armed evidently for the purpose of killing him in case he was released by the jury, and he insists that this testimony was admissible to show the animus of the witnesses. As to Billy Wilson, he was not a witness, but even as to this matter, the bill is not complete. On page 436 of the stenographer's report, we have this colloquy: "Q. Do you know Mr. Billy Wilson? A. Yes, sir. Q. Do you know where he is now? A. No, sir; I do not. Q. Have you had any trouble with any of the Wilson's since then? The State objected; the objection was sustained, and defendant excepted." What the witness would have testified about is not stated.

On page 453 of the transcript we have this statement: "At request of the defendant, the jury were retired, and in their absence the defendant stated that he desired to introduce proof of certain matters, developed during the trial of this case, for the purpose of showing animus of certain witnesses who had testified; proposed to offer proof showing that the prosecuting witness came to the courthouse armed with two revolvers, a breech-loading shot-gun, and an ample supply of ammunition; that she had to be disarmed when she reached the courthouse by the officers of the court; offered for the purpose of showing that she came to do this defendant injury, and to show the animus of the witness; also offered to show that the son of the prosecuting witness and deceased, at a picnic somewhere in Cass County, sometime during the summer preceding this trial, and after this tragedy was consummated, committed an assault upon this defendant, shooting him three or four times; that this testimony was offered for the purpose of showing animus. To this testimony the State urged the objection, that same was immaterial, which objection was by the court sustained; to which action and ruling of the court the defendant at the time excepted." Now when Mrs. Wilson was on the stand it was permissible to show by her the state of feeling she entertained toward appellant or toward Ben Coffman, his co-defendant. If she had stated it was perfectly friendly, then it might have been permissible to have shown specific acts and conduct of herself directed toward appellant and his son, in contradiction of any assertion that she might have made with reference to her state of feeling; it may be that the matter here presented might have been inquired about, but as an independent matter proposed to be shown by no particular witness, we do not believe that it was admissible.

On page 458 of the record, appellant objected to the testimony of Mrs. Anderson, as to who she believed she saw riding the mule down from Mr. Coffman's house on same day preceding the homicide, and she stated that she took it to be appellant, it looked like him, and it traveled like his mule that he generally rode to town. We think this character of testimony was admissible; that is, as to the matter of identity; she could state her best judgment or knowledge.

We do not believe it was competent for appellant to have introduced Ben Coffman as a witness; he was indicted for the same offense as appellant, and had not been tried. Furthermore, it was competent on the part of the State to show by any legitimate testimony the guilt of Ben Coffman.

Appellant strenuously urged that he is entitled to a new trial because of newly discovered evidence, to wit: the evidence of James as to the tracks of appellant's mule. It is stated that this witness James has imparted to appellant, since the trial, that he tracked the mule of appellant on that Saturday evening, or the next day, from his house back east in the direction of appellant's house and passed the lane, and that said tracks did not go down into that lane or come out of the lane into the road. It is stated that this testimony is material and newly discovered, in view of the fact that the State's theory is that appellant, after the homicide, came out of that lane into the road, and came up in the direction of James house on his way to Jefferson. We do not understand this to be the theory of the State; no witness testified that appellant came out of that lane; looking over the whole testimony the inference is very strong that the State does not rely at all on his coming up that lane after the homicide, but that he either went through his field some way and came up to his own house, thence out in the big road, or else he went around deceased's field and his field on the east side thereof, and came up by his house. At any rate, there is no testimony that anybody saw the tracks of his mule coming up out of that lane or that they were traced there. Besides this, the witness James was placed on the stand three times by appellant, and appears to have been very friendly to him, and was questioned in regard to the case thoroughly; even if this testimony was important, it would seem to be a lack of diligence on the part of appellant that he did not make inquiry of this witness as to tracking the mule anywhere on that Saturday evening or the next day.

Appellant in his motion for a new trial claims that the testimony of T. N. Lockett is newly discovered and is important. The newly discovered testimony of this witness consists of measurements and views taken of the ground with reference to distances and intervening timber between objects testified to by other witnesses in the case. We do not believe, in regard to this witness, there was any diligence. It could not but have occurred to appellant that it was important to show the distances between certain points in the vicinity of the homicide, and to show the situation of the timber as between certain points; and a great deal of testimony pro and con was introduced on this line. We do not believe that this testimony could be considered in the nature of newly discovered evidence; if it could be deemed important, this witness was more than 70 years old, and his survey was made more than a year after the homicide, and besides, it does not occur to us that it materially conflicts with any testimony introduced by the State; in fact, there was some important testimony of Mrs. Anderson, and this, it

appears to us, to be corroborative of hers. We do not believe there is anything in this newly discovered evidence.

Apllant objected to the court's charge on principals on the ground that there was no evidence showing that appellant was present at the time of the alleged homicide, even if it be conceded that Ben Coffman committed the homicide. We have heretofore stated, in a general way, the circumstances pro and con, and in our opinion there was ample testimony to have authorized a charge on the subject of principals as applied to appellant, and there is ample testimony to support the finding of the jury that he was a principal in the homicide. If the testimony of the State is to be believed, he was unquestionably, at the time of the homicide, in that immediate vicinity, either keeping watch and notifying his son Ben of the coming of deceased, or doing some act in aid of the general purpose and consummation of the design to kill. We note that the court, in the charges on this subject, not only required that if they believed Ben did the killing, that they must believe that appellant was present at the time, and knew of his unlawful intent and participated in same with him.

We believe the court's charge on circumstantial evidence was pertinent to the evidence in this case, and is not subject to the criticism indulged in by appellant. The charge, after stating the rule as to circumstantial evidence, required the jury to believe that the accused and no other person, unless it was Ben Coffman, did the killing, and that defendant acted together with him, if he did the killing.

It occurs to us that the charge on alibi sufficiently safeguarded appellant's rights, and that was his main defense.

There being no errors in the record, the judgment is affirmed.

*Affirmed.*

Brooks, Judge, absent.