JAMES POWELL v. THE STATE.

No. 11916.   Delivered November 7, 1928.
Rehearing granted State May 8, 1929.

The opinion states the case.

*Walter E. Jones* of Jourdanton, and *Douglass, Carter & Black* of San Antonio, for appellant.

*C. S. Slatten,* District Attorney of Jourdanton, *G. A. Walters* of San Saba, and *A. A. Dawson* of Canton, State's Attorney, for the State.

HAWKINS, JUDGE.—Appellant was convicted for the murder of Leon Means, punishment being assessed at fifty years in the penitentiary.

The indictment contained two counts; the first alleging that appellant "did voluntarily with malice aforethought" kill deceased by shooting him with a gun; the second alleging that appellant "did voluntarily" kill deceased, etc. By motion in arrest of judgment the indictment was attacked as not properly charging murder under the new murder statute. (40th Leg. Ch. 274, amended by Special Session same Leg. Chapter 18.) The opinion expressed in Crutchfield v. State, (No. 11418, opinion on rehearing October 31st, 1928) is against appellant's contention.

Deceased and appellant worked together in a garage at Leming. So far as the record shows they were on friendly terms. Deceased slept in the garage. Between daylight and sun-up on August 26th, 1927, a deputy sheriff who lived near heard a shot from the direction of the garage. He dressed and hurried over there. Appellant was seen some forty yards from the garage walking at an ordinary gait going in the general direction away from the garage and towards his home. Means was found on his cot. He had been shot through the arm, the same bullet apparently causing a wound in the neck. About an hour later the sheriff went to appellant's house to

arrest him. Appellant shot himself. The record is silent as to any suggestion of motive prompting appellant to kill Means.

When the deputy sheriff arrived at the garage—which was eight or ten minutes after he had heard the shot—upon discovering Means to be wounded, he asked who shot him, to which Means replied, "Powell, I reckon"; the officer then asked if he said anything, to which Means replied, "Yes, he said something, but I was asleep and didn't understand him." The reception in evidence of Means' statement was objected to because no predicate was laid for its admission as a dying declaration, and for the further reason that it was a conclusion of the injured party. The statement appears to have been admitted as res gestae. That it was res gestae in point of time seems certain, but that does not render admissible everything that might be said under such circumstances. In Corpus Juris, Vol. 22, Sec. 558, the rule is thus stated: "Expressions of opinion are not ordinarily admissible as part of the res gestae." This rule has been given effect in our own state in civil cases as evidenced by the citation of authorities under the quoted text, and it applies with equal force in criminal cases. In applying the rule frequent difficulty has arisen in determining whether the statement objected to was a mere conclusion or a shorthand rendition of the facts though bearing the appearance of a conclusion. See Williams v. State, 40 Tex. Cr. R. 497, 51 S. W. 220; Williams v. State, 40 Tex. Cr. R. 565, 51 S. W. 224; Warren v. State, 9 Tex. Cr. R. 629; Lockhart v. State, 53 Tex. Cr. R. 589; 111 S. W. 1024; Clark v. State, 56 Tex. Cr. R. 293, 120 S. W. 179; Craft v. State, 57 Tex. Cr. R. 261, 122 S. W. 547; Couch v. State, 93 Tex. Cr. R. 27, 245 S. W. 693. After reviewing many authorities it was said in Couch's case:

"Neither the deceased nor accused, when laboring under such pain or excitement as will admit their statements as res gestae, make choice of words which otherwise might be selected with more care. The question always is: Can they with reasonable certainty be said to express facts although bearing the semblance of opinion?"

Applying that test to the statement proven over objection in the present case much difficulty is encountered in giving it construction other than as the conclusion of the wounded man. The effect of the statement appears to be that the wounded man was asleep; that something was said which was not understood by him; that he was shot and he "reckoned" Powell did it; in other words he "thought" or "supposed" or "concluded" Powell did it. (Webster's Int. Dictionary.) To turn the statement back into the order in which it

was developed and fairly construed we have: (Q.) "Who shot you?" (Ans.) "Powell, I reckon." (Q.) "Did he—the man you reckon was Powell—say anything?" (Ans.) "Yes, he said something but I was asleep and did not understand it."

We have been unable to reach any other conclusion than that the statement complained of should have been excluded as a mere conclusion of the deceased. Its harmful character is patent.

The judgment must be reversed and the cause remanded.

*Reversed and remanded.*

ON MOTION FOR REHEARING.

LATTIMORE, JUDGE.—The State questions the soundness of our conclusion as expressed in the original opinion, in a motion for rehearing, supported by an able oral argument. Upon reflection we are convinced that for good reasons the motion for rehearing should be granted.

Briefly stating the facts,—at the early hour of 6 o'clock A. M., as fixed by witness Witten; between daylight and sunup, as fixed by Mr. Keith, when apparently every person in the little village, including deceased, was asleep,—a shot was fired into the body of Means who was on a cot in the garage where he ordinarily slept and in which only he and appellant worked. Parties who reached the scene in a few minutes found deceased shot in a manner precluding self-infliction, and fixing the fact that he was shot while lying on his cot. A statement of the deceased plainly admissible established that when shot he was asleep. No weapon was found in the garage save a small old pistol in a pigeon hole which witness said he did not think could be cocked. Two men of veracity unassailed saw appellant near said garage and going away from it, and towards his home, a half mile distant, within a few minutes after the shooting. Both witnesses averred that they saw no other person astir at that time or around there. Appellant appeared upon the scene no more, but when the sheriff with others went to his home less than an hour later and called, they got no response; other calls failed to elicit answer; the screen door was fastened; after a number of knocks on the door appellant's wife appeared. She was asked to open the door but did not do so. After repeated requests the officer took hold of the door and harshly told her to open it. When she did so and he stepped inside he heard the noise of a pistol being cocked in an adjoining room. He called out to Powell, and called to the posse to watch the doors and windows, and stepped to the door. As he

did so appellant shot himself and fell to the floor. Fourteen 45 caliber pistol cartridges were found on his person, and the pistol with which he shot himself was of that caliber. He was not fatally injured, was indicted and tried. Upon the trial he did not testify nor introduce his wife, nor any witness to account for his presence at the garage at the time of the homicide, nor to shed light on or explain his relations with deceased, or his other actions. Every track in this case enters the lion's den, none come out; every fact in evidence points its accusing finger at appellant, none even suggests that possibly another may have slain the sleeping victim. A great American, speaking of the course open to a murderer, concludes by saying: "There is no escape from confession but suicide, and suicide is confession." It seems then that the other facts in this case, aside from the statement of the deceased, make evident that appellant is the guilty party herein.

Upon mature reflection we conclude that the first statement attributed to deceased, to-wit: "Powell, I reckon," was not such opinion as called upon the trial court in the exercise of his discretion in the matter, to sustain the objection made thereto. In the Century Dictionary appear many definitions of and synonyms for the word "Reckon," such as, to compute; to calculate; to consider; to regard; to base a calculation; to rely upon; to depend on; to have an impression; to think; to suppose. In determining the admissibility of such a statement care must be had both as to what was said and also to ascertain the surroundings, antecedents, etc., of the statement, also its purpose. That Means had been shot when Keith reached him was evident. The question was who shot him? He and appellant had been working together in the same garage, knew each other well, doubtless from appearance as well as voice. Apparently they were on friendly terms. It might not be amiss to call attention to the fact that Powell was near to and apparently coming from the garage when first seen a very few minutes after the shooting. Indeed it seems that in determining the character and admissibility of the expression used by deceased to Mr. Keith, we would be justified in taking into consideration all the surrounding facts and circumstances in order that we may arrive as near as possible at the correctness of the so-called opinion. These facts have been stated to some extent above.

Turning to the authorities in order to find what the text writers have said, we find in Mr. Greenleaf's work on Evidence, 16 ed., Sec. 4301, p. 527, the following:

"Quality of knowledge; 'Belief,' 'Impression,' 'Opinion.' When a witness expresses his thought upon the matter in hand, it may be that he does not assert it with the positiveness of knowledge, but qualifies his state of mind on the subject as a 'belief,' 'impression,' 'opinion'; he may 'think,' or 'suppose' the matter to be so. These expressions are ambiguous in that the qualification may be due to one of three distinct sources. (1) *He may have had no actual observation or source of knowledge at all, but may have made up his mind merely by guess or conjecture;* when this appears to be the case *he is evidently not qualified, and his 'impression' etc. is not admissible.* (2) *He may have had actual observation of the matter but he may not have received a very definite impression; e. g. he saw a man and 'thought' it was the accused; to this defect in the quality of the impression the law makes no objection, but receives it for what it is worth.* (3) *He may have had entirely clear and positive impressions at the time but his recollection of them is not as strong as it might be; here also, the law accepts whatever quality of recollection he is able to bring. In short if he has actually observed, the quality of the impression and the strength of its persistence are no grounds of objection."*

Mr. Wigmore in his work on Evidence, 2d ed., Sec. 657, says that a witness who testifies from knowledge must have obtained that knowledge from the exercise of his own senses, which statement is followed in Sec. 658 by the further proposition that such knowledge need not be absolute or positive, but that it suffices if the witness had had opportunity for personal observation, so that he had gotten some impression from his observation (by which term "observation," as here used, we understand the author to mean any information obtained by the exercise of his own senses). Further in said section the author says:

" 'Belief' or 'impression' may signify merely the degree of positiveness of his original observation of the facts. The witness may have 'had actual observation of the matter in hand, but the result may have been a not very definite or positive impression; for example, he saw a man and 'thought' that it was the accused. In such cases there is no legal objection whatever to receiving such impression as the witness gained from his observation. In other words, the degree or quality of his knowledge, so far as there was actual personal observation by him, is no ground of objection.

" 'Belief' or 'impression' may signify the degree of positiveness of the witness' recollection; i. e., may signify that he obtained en-

tirely clear and positive impressions at the time, but that since then his memory has faded, and his recollection today is so weak that he is not able to call it more than an 'impression' or to say more than 'I think.' The deficiency comes merely on such grounds. It welcomes whatever quality of recollection he is able to bring. In general, then, where there has been actual observation, the quality of the impression received at the time and the quality of persistence of that impression are no grounds of objection; for the simple reason that Courts must accept the facts of human nature and must not insist on what they cannot fairly expect."

So, also, in Sec. 728 of the same work, the same learned author uses the following language:

"So far as the terms 'impression,' 'belief,' and the like, signify a total lack of original observation, a mere conjecture based on rumors, intuitions, prejudices, or the like, such testimony is inadmissible; the authorities in which this sense is unmistakably the one intended by the Courts have already been examined (ante, par. 658); (2) So far as these terms signify merely an inferior quality (a) in the observation or (b) in the recollection of the witness, such testimony is receivable, subject to the trial court's discretion."

So in Sec. 658 we also find the further conclusion expressed:

"What the courts repudiate, then, is a mere guess, and exercise of the imagination, a suspicion, a conjecture, offered in place of the result of actual personal observation; it is from this point of view only that a 'belief' or 'opinion' or 'impression' is not to be received."

In Elliott on Evidence, Vol. 4, Sec. 2715, we find the following:

"Identity.—After the corpus delicti is proved the next thing, ordinarily, is to connect the accused with the crime, and for this purpose direct evidence of his identity as the perpetrator of the crime is, of course, admissible, and it is held that the identifying witness need not be positive, but may speak according to his best impression and belief."

Our own decisions hold that a witness may state his belief or best impression as to the identity of a person, and that the fact that such witness can not be positive in such identification goes to the weight of the testimony but not to its admissibility. Cooper v. State, 23 Tex. 338; Tate v. State, 35 Texas Crim. Rep. 234; Brooks v. State, 37 S. W. Rep. 739; Sparkman v. State, 61 Texas Crim. Rep. 429; Coffman v. State, 51 Texas Crim. Rep. 486; Miller v. State, 80 Texas Crim. Rep. 226; Jenkins v. State, 81 Texas Crim. Rep. 508; Emery v. State, 95 Texas Crim. Rep. 336; McCoslin v.

State, 96 Texas Crim. Rep. 175; Burks v. State, 97 Texas Crim. Rep. 113.

Bearing in mind that Means was unquestionably shot while asleep, and that he said eight or ten minutes afterwards, when asked who shot him, "Powell, I reckon," let us determine whether the trial judge was abusing his discretion in holding this not a mere conjecture or guess, or the exercise of imagination, such as is definitely rejected in Sec. 658 of Wigmore on Evidence, supra, but that such statement was a belief of deceased having for its basis knowledge derived from the exercise of his senses, in which case the statement would seem admissible at least as a circumstance on the question of the identity of the slayer. Of course, if Means was alive, and on the witness stand, the natural and proper thing to do would be to inquire of him what formed the basis of his conclusion, but he is dead and we must explore other avenues.

We notice first those negative in character. There is not one thing in this record to indicate that Means would falsely lay such a charge against Powell, or to lead to a belief based on former relationships such as threats, grudges or difficulties, that these would cause him to think that Powell had shot him. Turning to those facts supporting the conclusion that Means had at least partial knowledge derived from the exercise of his own senses, which made his opinion as to the identity of the slayer admissible, let us briefly analyze the situation. As stated, Means was shot while asleep, but that the shot waked him, and that what occurred in his presence and hearing after the shot, would be heard and seen by him, seems a proper conclusion. If the man who shot him was in the garage, or within range of Means' vision, it then being daylight, Means would likely have seen him, and if it be a man whom he knew, he would likely recognize him. The presence of Powell near the garage, as testified to by other witnesses; the absence of any other man at the time of the shooting near the garage, as testified to by the same witnesses, the exact accord of the statement of deceased with the facts otherwise evident,—would seem to be enough to form the basis of a conclusion on the part of the trial court that said statement rested on the exercise of the physical senses of Means, when all the facts and circumstances were considered. Do the proximate facts strengthen the hypothesis that when Means was waked by the shot, Powell was in the garage? They do. Look at them. Keith said that he lived fifty or sixty yards from the garage, heard the shot, dressed rapidly, taking but one or two minutes to dress, and went rapidly to the

garage; that when he got out where he could see, he saw Powell "leaving the garage"; saw no one else up or around there. On cross-examination this witness said that Powell was about fifty yards from the garage, walking away from same, going toward his home. Witten swore he heard the shot, jumped out of bed, went to the door,—then called to Keith. He saw no one around there at all. After he dressed hurriedly, he saw Powell about forty yards from the garage walking rapidly toward his home. It would seem logical to us that this testimony fixes the fact that the man who shot Means was inside the garage at the time when these two witnesses came to their doors and looked around and saw no one. If he was in the garage it would seem entirely a reasonable conclusion to believe that Means must have seen him after he was waked by the shot. If no one else was up and about, and in a few minutes after the shooting Powell was seen going *from* the garage, toward which he would naturally be going at that time of day; *from* where his partner and friend lay mortally wounded, this strengthens the conclusion that Powell was in the garage and did the shooting. Further, if the facts testified to by the sheriff as to what occurred at Powell's home, as set out above, are to be given any weight at all, they certainly strengthen the conclusion that Powell was the man who shot Means, and that he was necessarily in the garage at the time of the shooting.

Not only do these facts show Means' opportunity to see Powell, and also stand in such juxtaposition to the shooting as to make his expression of belief seem indicative of knowledge almost positive,— but we have in addition his further answer to the second question put to him by Keith as to whether the man who shot him said anything, "Yes, he said something * * * but I did not understand." We do not think the expression used in this connection: "I was asleep" could be held to mean that when the slayer said the things evidently heard by Means, the latter was so asleep as not to have heard them at all. This would lead to the necessary conclusion that Means heard nothing. Common experience teaches that persons suddenly aroused from sleep are apt to be easily confused, and this would seem more likely in case the awakening cause was the shock of pain and bloodshed. We think the words quoted in our original opinion from Couch'v. State, 93 Texas Crim. Rep. 27, fit here:

"Neither the deceased nor accused, when laboring under such pain or excitement as will admit their statements as res gestae, make choice of words which otherwise might be selected with more care. The question always is: Can they with reasonable certainty be said to express facts although bearing the semblance of opinion?"

Also under such circumstances the party making the statement is not apt to be careful in the tenses of his verbs or the quality of his descriptives. Means affirmed positively 'that he heard his slayer talking. He said "Yes" to the question, if he said anything. So then we have here the further fact that by the sense of hearing also Means had testimonial knowledge as to the identity of his slayer. It seems fair to conclude from the facts that before the time Means made the statement to Keith, objection to which is the basis of this bill, he must have both seen and heard the man who shot him. Doubtless the only reason Means did not positively affirm that Powell did it, was because the actual shooting took·place contemporaneous with his waking. We believe it correct to apply the principles set out in the cases cited and in the text writers quoted from above, and must conclude that the opinion of Means embodied in the statement complained of had for its basis sufficient knowledge to justify the trial court in admitting same in evidence as an opinion based on the observation of the witness.

It follows from what we have said that in our opinion the State's motion should be granted, the judgment of reversal set aside, and the judgment now affirmed, and it is so ordered.

*Motion granted.*

### ON MOTION FOR REHEARING DISSENTING OPINION.

HAWKINS, JUDGE.—I reluctantly find myself not in accord with the opinion in which the state's motion for rehearing is granted and an affirmance of the judgment ordered, and without any attempt at lengthy argument will briefly state my reasons in addition to what was said in the original opinion.

Whether deceased's statement was admissible presents a close question. If with reasonable certainty it might be said that deceased's opinion as to the identity of his assailant was based on what he saw or heard at the time of the assault, then the objection would go to the weight of the evidence rather than to its admissibility. No witness saw appellant in the garage or saw him leave it. When first seen by any witness appellant was some forty yards from the garage a few minutes after the shooting, going towards his home. It may be a reasonable inference that he had been at the garage but after all it is only an inference. There is nothing in deceased's statement conveying the direct information that he thought he recognized appellant, either by sight or voice. The deduction that he did do so is another inference reached by a process of

reasoning from other facts in the case, so, before the statement objected to becomes admissible two inferences must be indulged, neither of which can with any reasonable certainty be based upon the statement itself. Under such circumstances it appears to me both unsafe and unsound to have admitted the statement in evidence.

It might not be improper to suggest another thing if inferences are to be indulged. The record discloses no motive for the killing, yet we know that such killings do not occur without something prompting them. If appellant had a motive to kill it would be a fair inference that deceased also had knowledge of the thing, whatever it may have been, which induced the killing and therefore based his statement upon that knowledge rather than upon anything he saw or heard at the time of the assault.

In my opinion the state's motion for rehearing should be overruled and I most respectfully record my dissent to the contrary conclusion reached by my brethren.