HARRY WILLIAMS V. THE STATE.

No. 1656. Decided May 3, 1899.

1. **Murder—Evidence—Threats by Defendant Not Directed Towards Anyone by Name.**

On a trial for murder, which grew out of a newspaper article concerning a difficulty between the wife of defendant and a negro woman, and in which article it was stated that defendant stood by and saw his wife whipped by the negro woman; Held, that it was admissible to prove that a few days after the said difficulty, but before the appearance of the scurrilous newspaper article aforesaid, defendant said he had heard it reported around town that he stood by and saw a negro woman beat his wife; that he would give five dollars to find out the man who started it, and would give him six shots in exchange with a sixshooter. While the threat did not name deceased, or anyone in fact, still it showed the animus of defendant against the party who started or circulated the report, and clearly embraced deceased within its terms.

2. **Same—Libel—Evidence.**

On a trial for murder, where it appears that the killing grew out of a libelous publication in a newspaper about a difficulty between the wife of defendant and a negro woman, Held, that it was competent under provisions of subdivision 2 of article 747, Penal Code, with regard to libel, to prove the facts in connection with the said previous difficulty.

3. **Same—Reputation of Defendant's Wife for Chastity.**

On a trial for murder, which grew out of a libelous publication concerning defendant and his wife, but which libel did not in any manner attack or impugn the reputation of defendant's wife for chastity, Held, it was incompetent and inadmissible for the State to introduce testimony to prove that the wife was a woman of unchaste reputation, her reputation for chastity not being an issue involved in the libel. The effect of such illegal testimony was calculated to prove very prejudicial to defendant.

4. **Same—Evidence as to Character.**

Evidence of character, when admissible, ought to be restricted to the trait of character which is in issue, and bear some analogy and reference to the matter under investigation.

5. **Same—Putting Character of Codefendant, Not on Trial, in Issue.**

The general rule is, that the character of a defendant can not be put in issue unless the initiative in that regard has been taken by defendant; this rule applies also

40th Crim. Reps.—32

as to the character of a defendant's wife who is a codefendant not on trial, and who has not been introduced as a witness in the case. There is no rule of law known to the court which under such state of case would admit proof of the general reputation of defendant's wife.

**6. Dying Declarations.**

A statement in a dying declaration, "When they came in I treated them perfectly gentlemanly; they added insult after insult," is inadmissible as evidence, it being the opinion or conclusion of the declarant, and not a legitimate shorthand rendering of the facts.

APPEAL from the District Court of Erath. Tried below before Hon. J. S. STRAUGHAN.

Appeal from a conviction for murder in the second degree; penalty, eighteen years imprisonment in the penitentiary.

The indictment charged appellant with the murder of A. A. King on the 8th day of August, 1898, by stabbing him with a knife.

The first appeal in this case will be found in Ex Parte Williams, 39 Texas Criminal Reports, 524, which was an application for bail. The main facts are stated in that case, and the opinion below states the salient features of the evidence so fully that a further statement is unnecessary.

*Daniel & Keith* and *Martin & George,* for appellant.

*Robt. A. John,* Assistant Atttorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of eighteen years; and he prosecutes this appeal.

The theory of the State, which was supported by evidence, was to the effect that the homicide was committed by appellant, Harry Williams, and his wife, on account of malice entertained toward deceased because of a publication concerning a fight between the wife of appellant and a negro woman. Inasmuch as this publication occasioned the homicide, we would state that deceased, Austin King, and John Hibdon were the editors and publishers of the Appeal, a newspaper published at Stephenville, in Erath County. The publication was made about Saturday, the 8th day of August, 1898, and is as follows:

"Negro and White Woman Scrap.—On last Saturday there was a lively scrap on aristocratic College Hill between two women of different complexion,—one a beautiful blonde, and the other as black as the king of hades. The story, as told a reporter of the Appeal, is about as follows: Mrs. Williams, nee Mrs. Skipper, has a little boy some seven or eight years old, who got into a childish difficulty, as children of that age sometimes do, with a little pickaninny belonging to Tish Adams, and during the fray young Skipper hit the negro with a rock on the head, hurting him severely. The mother of the coon went to Mrs. Williams, bringing with her her boy, to show cause why Mrs. Williams should not severely chastise her pugilistic offspring for spilling African blood. Mrs. Wil-

liams could not see the propriety of belaboring her boy in that light, but went to the house and came out armed with a buggy whip, which she proposed to wear out on the she coon. By this time Tish had worked up her fighting qualities to a white heat, and dared her to use that whip on her black hide; and on the first demonstration the coon gave Mrs. Williams a tap on the proboscis, and at the same time got possession of the whip, with which she flailed Mrs. Williams' plump person hard and fast until the negro got exhausted and Mrs. Williams fell to the ground in a swoon. It is alleged on good authority that the husband of Mrs. Williams stood there, a silent witness to this dastardly outrage, and if such is the case, a respectable committee of white women should wait on the woman who bears his name, and request her to sue for an immediate divorce, for no man but a skulking cur would stand by and see a white woman whipped by a negro. It may be the custom in Indiana, but it won't stand muster in Texas. It is further stated by our authority that after the flogging this eunuch monstrosity had the gall to bring his wife a butcher knife and tell her to use it on the black woman. The negro told him he was a coward, and if anyone had a right to use that knife it was him."

On the day of the publication Williams and his wife, who lived in the town of Stephenville, made a visit to the country, some nine miles from town, and spent the day. There they were informed that the publication concerning the previous trouble between his wife and the negro woman had been made in the paper in Stephenville. They returned to their home about night, and Frank Heizer, the son of Mrs. Williams, informed them at the supper table in regard to the publication, and that he had read it. They sent for the paper, and after perusing it, Williams and his wife got in their buggy and went down town to the residence of one Eugene Moore, the editor of another paper, and inquired of him in regard to said publication and their rights in the premises, and were informed by Moore that the parties were not civilly responsible, but might be held criminally responsible. It appears that here some threats were made by appellant or his wife with reference to horsewhipping the editors of the Appeal, who had caused the publication. Moore, however, advised them not to do it. Both parties seem to have been very much excited. They returned to their home, and it does not appear that they left there during the following day, which was Sunday. On Monday morning, Williams (appellant), his wife, and their son, Frank Heizer, got in their buggy and went down town for the purpose of seeing the editors of the Appeal, and causing them to correct the publication, and, according to the theory of the State, horsewhip the publishers at all hazards. Williams or his wife (from the State's testimony it can not be determined which) was armed with a dirk knife, the blade of which was some four and a half inches long. They drove to the courthouse. Appellant got out of the buggy and went into the courthouse for the purpose of procuring a pistol, which he failed to get, while his wife and son, who remained in the buggy, drove to a store near by, and she purchased a buggy whip. They then drove back to the courthouse. Appellant came out and joined

them, and they drove to the office of King & Hibdon, the editors and publishers of the Appeal. The parties immediately got out of the buggy, hitched their horse, and proceeded upstairs to the newspaper office. Frank Heizer followed with the buggy whip. They met a negro boy, who showed them into the office, and at their request went for Austin King, deceased. He came into the office presently, and his attention was immediately directed to the publication contained in the copy of the paper which the parties had brought with them. An altercation occurred as to the matters contained in said publication. According to the theory of the State, appellant and his wife brought this on by stating that they had come for revenge, and that appellant, Williams, would hold deceased while his wife horsewhipped him. None of the State's witnesses, however, were immediately present. Some of them were in the immediate vicinity, outside, in the hall, and this theory is gathered from what they stated they overheard from the parties during the altercation. It appears to be conceded that all three parties engaged in the fight. Mrs. Williams attempted to use the buggy whip on deceased. She appears to have been shoved or knocked aside early in the fight, and appellant and deceased scuffled and fought around the room for several minutes. About the time the parties rushed in, one of the witnesses testifies to seeing Williams with his right hand in the act of pulling a knife out of deceased and throwing it on the floor, which was subsequently picked up by Mrs. Williams. The theory of the State is that Williams may have done the stabbing with the knife himself, or his wife may have done it; that if she stabbed deceased, and left the knife sticking in him, appellant is equally guilty with her, as the stabbing was done in pursuance of a conspiracy between them to make him take a horsewhipping or else kill him. At the termination of the difficulty, deceased was found to be stabbed on the right side, two mortal wounds having been inflicted. He was immediately taken down stairs, and lived about thirty hours, dying from the effects of the wounds. Appellant's testimony in regard to the stabbing tends to show that his wife did the stabbing, and that he did not know of it until after the fight was over. In this connection it is further shown by defendant: That in going to the place the only understanding between them was that they were to horsewhip appellant. That they had no agreement as to what they would do if he refused to be horsewhipped. That they went there to horsewhip the man who wrote the article, and they intended to horsewhip him, regardless of whatever opposition they met. That when King came into the room they accosted him, and asked him if he wrote or was responsible for the article (showing it to him), and he said he was, and defendant told him then that it was a lie. That deceased slapped him on the shoulder, and said: "Hold on, Williams. I have damned good authority for that article." That his wife then asked him who was his authority, and he said, "Snapp." That appellant then turned to the page and commenced reading the article, and asked deceased if he did not know he had slandered his wife. That deceased denied that it was a slander. That appellant asked him if he knew what "proboscis" meant. Deceased

said it was the fore part of the face. Appellant told him it was the snout of an elephant. About that time appellant's wife interrupted and said, "Mr. King, did you ever see me before?" Deceased replied, "No, ma'am." She then asked him, "What did you know about my form or my complexion?" And he said, "What in the hell have you got to do with it?" She replied, "I will show you," and picked up the whip, and deceased jumped at her and struck her in the face. That then the fight began. That they first scuffled over the whip, his wife engaging in the difficulty. That afterwards deceased and defendant fought around the room a short time, and he did not know that deceased was cut until after the fight was over. About the time the parties entered the room, King said: "Take him off, Charley; she has stabbed me." That he did not know when the stabbing was done. The State also proved by several witnesses that Mrs. Williams claimed to have done the stabbing at the time the parties rushed into the room. The theory of appellant was that the homicide, at most, could only be manslaughter, on account of the slanderous publication in regard to appellant and his wife. He further claimed that the evidence showed that deceased was stabbed by his wife without any knowledge or concert on his part, and that, under such circumstances, he could only be guilty of an aggravated assault. We have thus stated the substantial features of the case in order to discuss the assignments of error.

Appellant objected to the testimony of Jeff Owens to the effect that on Wednesday or Thursday of the week before the homicide, which occurred on the following Monday, defendant met witness on the south side of the square in Stephenville, and told witness that he was in a public business, where he was liable to hear a good deal of talk, and that they had been telling it around town that he had stood and let a negro woman beat his wife, and that defendant would give five dollars to find out the man who started it, and that he would give him six shots in exchange with a six-shooter. Defendant objected to said testimony because the same was irrelevant and immaterial and too remote, and the same was not testimony as to any declarations made towards or against the deceased, and the said conversation was had before the publication of the scurrilous article which appeared in the Appeal, and could not have been directed against deceased, and the admission of such testimony was prejudicial to appellant. In Godwin v. State, 39 Texas Criminal Reports, 404, the admissibility of threats or language of a defendant indicating animus was discussed, and the rule was there laid down that language indicating general animus, and not directed towards deceased, would not be admitted unless the language used was of a character showing general malice, and embracing deceased within its terms. And also see Holley v. State, 39 Texas Crim. Rep., 301. Now, applying the above rule to this testimony, we think it clearly embraced deceased within its terms; that is, appellant declared his animus against anyone who started or circulated the report. The difficulty about which the homicide occurred grew out of this very report, and the publication thereof in the Appeal; and, in our opinion, the same was admissible.

Tish Adams was introduced by the State, and she was permitted, over appellant's objection, to testify as to the prior difficulty between herself and Mrs. Williams, about which the publication was subsequently made in the Appeal. Appellant objected to the introduction of the facts concerning said difficulty, on the ground that the same was immaterial, irrelevant, and collateral, in no way related to deceased or the difficulty with him, and was calculated to prejudice the defendant's rights in the minds of the jurors. The court explained this bill of exceptions, by stating: "The defendant had introduced the article in the Appeal on their cross-examination of the witness Eugene Moore, and was contending that the said article was untrue, and this evidence was admitted as tending to show the truth of the article." In the admission of this testimony the holding of the judge below was correct. In our opinion, the article published in the Appeal was of a libelous character, and not only charged Williams and his wife with a penal offense, but alluded to them in a disparaging manner, disgraceful to them as members of society, and the natural consequence of which was to bring them into contempt among honorable persons. And our statute with reference to proving the truth of the matter alleged to be libelous, in justification of the charge, authorizes such proof where it is stated in the libel that a person has been guilty of some penal offense, and the time, place, and nature of the offense are specified in the publication. Penal Code, art. 747, subdiv. 2. We accordingly hold that it was competent to prove the facts in connection with that previous difficulty.

On the cross-examination of the defendant the State was permitted to prove that, a few weeks before the killing of deceased, defendant came to the justice of the peace of precinct No. 1, in Erath County, and filed a complaint and instituted a prosecution against one Jess Neblett for indecently exposing his person in the presence of his (defendant's) wife, and that shortly thereafter defendant came into the office of W. J. Oxford, an attorney, on some other business, and while there the question of the prosecution of Neblett came up, and said Oxford advised defendant that he was a stranger in the town, but that he (Oxford) had been here a long time, and that he knew the town and the people better than defendant, and that said Neblett had summoned a great many witnesses by whom he expected to impeach the reputation of defendant's wife for chastity, and that, if defendant persisted in the prosecution of Neblett, said Neblett would prove by said witnesses that defendant's wife's reputation for chastity was bad, and that, if such proof was made, it would likely cause defendant serious trouble, as defendant would not stand such imputations against his wife's character, and that said attorney advised defendant to drop said prosecution and dismiss said case against Neblett, and that, acting upon such advice, defendant did agree to drop said case, and did have said case against Neblett dismissed. Defendant objected to said testimony at the time, because the same was irrelevant and immaterial, and did not in any way show that the article published in the Appeal was true, and the same would prejudice the rights of appellant. We

think this contention of appellant is well taken. The charge contained in the published article was not an imputation of a want of chastity on the part of appellant's wife, but that she had been guilty of a penal offense in making an assault on a negro woman, and likely got the worst of it; and in that connection some disparaging remarks as to her person and as to the character of defendant were published. Nowhere in the publication is there an accusation of a want of chastity on the part of Mrs. Williams, and, if this had been original testimony as to the reputation of Mrs. Williams, it would not have been admissible. The rule is that "the evidence [of character], when admissible, ought to be restricted to the trait of character which is in issue, or, as it is elsewhere expressed, ought to bear some analogy and reference to the nature of the charge; it being obviously irrelevant and absurd, on a charge of stealing, to inquire into the prisoner's loyalty, or, on a trial for treason, to inquire into his honesty in private dealings." 3 Greenl. Ev., sec. 25; Leader v. State, 4 Texas Crim. App., 162. In the case cited the charge was libel, and the court there held the doctrine above enunciated. But the evidence here offered was not admissible as proof of reputation. It was merely an indirect way of getting before the jury illegal testimony of the reputation of the defendant's wife for chastity. In this connection we would further observe that the State was permitted to prove that the reputation of Mrs. Williams for chastity was bad. This was objected to at the time on the ground that it was irrelevant and immaterial, and because the article published in the Appeal did not attack the chastity of defendant's wife, and her reputation for chastity, though bad, could in no way constitute justification for the publication of said article. This was overruled, and a number of witnesses were permitted to testify as to her bad reputation for chastity. This evidence, as stated above, was not in response to any trait of character involved in the case.

The charge made in the publication was to the effect that appellant's wife had committed an assault on Tish Adams, and was therefore guilty of a penal offense, and in that connection disparaging and scurrilous observations were made in regard to appellant and his wife; and the further effect of the article was to suggest that they both had been guilty of an act disgraceful to them as members of society, and calculated to bring them into discredit among honorable people. Now, whatever proof of character could be offered on the part of the State, it should have been confined to a rebuttal of the charge made, as in justification of the libelous matter published; and proof admitted that Mrs. Williams was a woman of unchaste reputation was in nowise responsive to any issue made by defendant. See authorities cited above. It will be observed in this connection that appellant's main defense was manslaughter; that is, that the homicide was committed under the influence of sudden passion engendered on account of the slanderous publication against himself and his wife. No doubt, the object of the prosecution was to cut off this defense, and to furnish the jury a reason to believe that appellant's anger or passion could not have been aroused or excited on

account of said publication, because his wife was a woman of unchaste reputation, or, in other words, a lewd woman. While this rule might be invoked if the insult offered was as to the chastity of the wife, yet, as that issue was not involved in the publication, it was not legitimate testimony, but the effect of such illegal testimony was calculated to prove very prejudicial to appellant. The jury were liable to believe that his passion should not have been excited on account of the publication, because his wife was a bawd, and so, to that extent, appellant's defense of manslaughter would be impaired.

The State was also permitted to prove by two witnesses that they knew the defendant's wife, and were acquainted with her general reputation as being a virago, and a quarrelsome, fighting woman, and that such reputation was bad, to which testimony defendant, at the time it was offered, objected, because such evidence was irrelevant and immaterial, and showed no justification for the article written in the paper, and in no way showed the truth of the same, and was calculated to prejudice the jury against defendant. In addition to what has heretofore been said with reference to this character of testimony, we would further state that it is the general rule that the character of a defendant can not be put in issue unless such defendant takes the initiative in that regard. It is true, in this case proof was not offered of defendant's character, but the State put the character of his wife in issue. She was not a witness in the case, but a codefendant; and the relation existing between them, and their status in the difficulty itself, was such that, it occurs to us, the evidence of the character offered by the State as original testimony against the wife was, in effect, trenching upon the rule above suggested. But, however that may be, unless such testimony was authorized by some rule of law it was illegal, and we know of no rule of law which authorized it. Its evident purpose was to cut off appellant's right of defense on the issue of manslaughter, and, as we have before remarked, it was eminently calculated to have that effect with the jury.

The State offered the dying declarations of the deceased. Appellant objected to the following portion thereof, to wit: "When they came in, I treated them perfectly gentlemanly. They added insult after insult." This was objected to on the ground that it was irrelevant and immaterial, and was the opinion and conclusion of the witness making such declarations, and would not have been admissible if the deceased had appeared in court as a witness and given such testimony, and such testimony was calculated to, and did, prejudice the rights of defendant. Conclusions or opinions or a summary have been in some cases admitted in evidence where the same were of such a character that they could not be so detailed and presented to the minds of the jury as to impart to them the knowledge which the witnesses actually possessed: that is, mere language could not reproduce, and make palpable in the concrete to the jury, the actual fact in such cases. The conclusion of the witness admitted in evidence has been termed a shorthand rendering of the facts. Powers v. State, 23 Texas Crim. App., 42; Richardson v. State, 7 Texas

Crim. App., 486. Doubtless the same rule would be applicable to a dying declaration, but it does not occur to us that the portion of the dying declaration objected to would come under that head. The acts of the parties, it occurs to us, could have been here expressed: that is, what the deceased did that indicated his acts were gentlemanly, and, on the other hand, what the defendant and his wife may have done that was an insult.

Objection was made by appellant to the court's charge on manslaughter on the ground that it was too restrictive; that the court should have given the special charge requested by appellant on the subject, predicated on the assault made by deceased on appellant's wife, suggested by appellant's testimony, giving his version as to how the difficulty began. While the court's charge on manslaughter particularized an insult to appellant's wife, involved in the alleged slanderous publication, yet it authorized the jury to take into consideration all of the facts and circumstances both at the time and before; and we take it that it embraced the matter suggested in appellant's requested charge, and that the jury, under the court's charge, were authorized to consider all that happened at the time. However, on another trial of the case, should the facts be the same, it might be proper for the court to give some such charge as that requested by appellant on the subject of manslaughter, in addition to the charge given here.

Appellant also complains that the court refused to give his special requested instructions on aggravated assault. We presume that appellant insists that his own testimony raises the issue of aggravated assault. We have examined the same carefully, and, in our opinion, it does not present that issue.

There are several other assignments of error, but it is not necessary to discuss them here. But, for the admission by the court of the illegal testimony heretofore discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

[NOTE.—The State's motion for a rehearing was overruled without a written opinion.—Reporter.]