## WILL GANT v. THE STATE.

### No. 4478. Decided February 10, 1909.

**1.—Murder—Jury and Jury Law—Separation of Jury.**

Upon trial for murder it was reversible error to permit the jury to separate without being in charge of an officer; and this although the defendant consented thereto. Following Neal v. State, 50 Texas Crim. Rep., 583, and other cases.

**2.—Same—Misconduct of Jury.**

Upon trial for murder it was improper to take the jurors to an open-air theater and permit them to mingle with the audience attending the theater.

**3.—Same—Evidence—Husband and Wife—Privileged Communications.**

Upon trial for murder there was no error in excluding the testimony of the wife of the deceased with reference to threats made by her husband against the defendant and defendant's father when said witness and her husband were alone and not in the presence of others. Distinguishing Cole v. State, 51 Texas Crim. Rep., 89. Following Davis v. State, 45 Texas Crim. Rep., 292

**4.—Same—Evidence—Declaration of Deceased.**

Upon trial for murder testimony that the deceased on the evening of the homicide as he left his residence stated to his mother-in-law, as he was going to the place of the tragedy, to hurry up supper so they could make ice cream after supper was inadmissible.

**5.—Same—Charge of Court—Singling out Facts—Manslaughter.**

Where upon trial for murder the court undertakes to select and cull facts from the record and specifically point them out in his charge and submit them as a basis of manslaughter, sufficient of the facts should be stated so as to present fully and fairly the issue of manslaughter from any standpoint made by the facts or deducible therefrom; and where the court's charge in singling out testimony left out several matters of fact presenting the issue of manslaughter, the same was reversible error.

**6.—Same—Charge of Court—Different Assailants—Self-Defense—Manslaughter.**

Where upon trial for murder the evidence showed that two of the brothers of the deceased were approaching the scene of the difficulty in a threatening manner, the court in submitting self-defense and manslaughter should not have confined the standpoint of aggression to the deceased, but should have extended the same to that of the two brothers of deceased.

**7.—Same—Threats—Charge of Court.**

Where upon trial for murder, threats by the deceased were in evidence, the court should have given a clear and pertinent charge of this issue to the jury.

**8.—Same—Charge of Court—Self-Defense—Provoking Difficulty.**

Upon trial for murder a charge of the court that defendant had a right to arm himself and demand an explanation from the deceased was too restrictive and should have extended to the defendant's right to go armed on his premises, even if this included an unlawful purpose, unless such purpose was accompanied by some act or word that brought about the difficulty.

Appeal from the Criminal District Court of Dallas. Tried below before the Hon. W. W. Nelms.

Appeal from a conviction of murder in the second degree; penalty, thirty years imprisonment in the penitentiary.

The opinion states the case.

*Robert B. Seay* and *Wilson & Wilson,* for appellant.—On question of separation of jury, cases cited in opinion. On question of misconduct of jury: Wright v. State, 17 Texas Crim App., 152; Early v. State, 1 Texas Crim App., 248; Defriend v. State, 22 Texas Crim. App., 570; Grissom v. State, 4 Texas Crim App., 374. On question of testimony of wife of deceased, cases cited in opinion. On question of court's charge on manslaughter and self-defense: Watson v. State, 50 Texas Crim. Rep., 171, 16 Texas Ct. Rep., 587; Castro v. State, 40 S. W. Rep., 985; Mundine v. State, 37 Texas Crim. Rep., 5, 38 S. W. Rep., 619; Swain v. State, 48 Texas Crim. Rep., 99; Stacy v. State, 48 Texas Crim. Rep., 95; Adams v. State, 47 Texas Crim. Rep., 347; Cortez v. State, 47 Texas Crim. Rep., 10. On question of court's charge on self-defense confining aggression to the deceased: Meuly v. State, 26 Texas Crim. App., 274; McLaughlin v. State, 10 Texas Crim. App., 340; Cartwright v. State, 16 Texas Crim. App., 473; Jones v. State, 20 Texas Crim. App., 665; Beans v. State, 25 Texas Crim. App., 346; Arnwine v. State, 50 Texas Crim. Rep., 254; Roberts v. State, 48 Texas Crim. Rep., 378; Nelson v. State, 48 Texas Crim. Rep., 274. On question of defendant's right to go armed: King v. State, 51 Texas Crim. Rep., 208. On question of court's charge on threats: Swain v. State, 48 Texas Crim. Rep., 99; Armsworthy v. State, 48 Texas Crim. Rep., 413.

*F. J. McCord,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—The substance of the facts develop that about two years prior to the homicide deceased had married the daughter of J. M. Gant, she being the sister of appellant. For about a year after the marriage, deceased and his wife lived in the residence of his father-in-law; that at the termination of the first

year of this marriage, the deceased moved into a tenant house belonging ·to his father-in-law which was situate near the family residence. Appellant resided with his father at the time of the homicide, he owning a tract of land not far away which he cultivated. Deceased and appellant both·kept their stock in the barn belonging to J. M. Gant, father of appellant and father-in-law of the deceased. After the deceased moved to the tenant house,. two of his brothers, Pel Herring and Harle Herring lived with him. On Saturday before the homicide on Monday, Mrs. Herring, mother of the Herring boys, accompanied by another brother, Wayne Herring, came from Tyler to visit the deceased and were at his house at the time of the homicide. At the Gant residence there resided· J. M. Gant (father of appellant), his mother and two brothers, and the appellant. In the fall of 1907, Will Gant (appellant), sold deceased a buggy which was not paid for at the time. During the spring of 1908, appellant called upon the deceased for pay for the buggy and deceased gave him a check on a bank at Plano. This check was twice presented to the bank and in both instances payment was refused. The first ill-will between the parties arose in consequence of deceased not paying for the buggy and came up in conversation in regard to the above check. The deceased turned the buggy back to appellant and gave him a check for a small·balance, due appellant by deceased on a bank at Richardson. During the conversation in regard to the buggy and the refusal of the payment of the check, deceased became angered and offered to fight appellant, and, in parting told him that he would see him at another time. For the prosecution the three brothers, Pel, Wayne and Harle Herring, testified in substance that on the evening of the homicide, deceased went over to the barn, which, as before stated, was used in common between J. M. ·Gant, appellant, and the deceased, Lige Herring. His purpose in going to the barn seems to have been to secure corn with which to feed his ·stock. They testify to seeing the difficulty in the hallway of the barn in which they state that J. M. Gant, father-in-law of deceased and father of appellant, undertook to strike deceased with a large stick or club, which had been used to prevent a cow from sucking herself and which had laid around the barn after the cow had been sold. They state that deceased jerked the stick out of old man Gant's hand and threw it away; they also state that J. M. Gant struck deceased about the head or neck with the stick and knocked off his hat and that J. M. Gant threw the hat of deceased over the fence; that deceased went down to the gate of the barn lot and went outside; that appellant and his father went down in the lot and it was at that time that J. M. Gant threw the hat over the fence; that deceased procured his hat and started back inside of the lot; that as deceased came in at the gate of the lot appellant drew his pistol and shot twice; that old man Gant had a pistol drawn and made threats against

the Herring brothers, who, they say, were not engaged in the difficulty, but who were coming up to the gate at the time.     These witnesses testify also that at the time deceased was shot he did not have anything in his hand; that they only heard and saw two shots fired.     J. M. Gant and appellant both testified to the effect that they were in the barn feeding when the deceased came there; that appellant asked deceased about some mail that deceased had received which belonged to him, appellant; that deceased stated that he had not kept any mail which belonged to appellant, and appellant said that the mail man had told him that he had delivered to the deceased a postal card for appellant; whereupon, deceased denounced the mail carrier and appellant both as 'damn liars' and told appellant that if he would come out of the lot he would beat him to death; that deceased picked up at this time the heavy stick referred to, which is thus described in the record:     A smooth seasoned elm stick about three and one half feet long and one and one-half or two inches in diameter, and weighing six or seven pounds, with iron fastenings in each end thereof.     They further testified that the wind was rather high and as the deceased started out of the lot gate his hat blew off and remained in the lot; that J. M. Gant, appellant's father, did not strike deceased with a stick nor did he have it; that after deceased went out of the gate, appellant's father ordered him to shut the gate which had been left open by deceased, and put the hat of deceased over the fence; that the hat blew some distance and deceased picked it up and came back into the lot, at which point appellant was standing, having gone there in obedience to his father's request to close the gate.     They further testified that at the time deceased picked up the hat he made what they term a "hello call" which brought two of his brothers, Pel and Wayne, from the house.     Appellant and his father further testify that deceased came on up to where appellant was, in a threatening manner, with the stick in his hand as if to strike with it; that appellant stepped back three or four steps and ordered the deceased to stop; that he did not cease advancing and appellant fired three shots.     They further testified that Pel Herring had a hoe in his hand and was but a short distance behind the deceased and coming, and remarking: "I will cut his head off with the hoe."     That Wayne Herring was behind them grabbing at something on the ground as if trying to pick up a rock and remarking:     "I will kill them both."     The father of appellant says he did not draw his pistol, but when Pel Herring was coming at appellant with the hoe remarking that he would kill appellant that he, J. M. Gant, remarked to Pel Herring: "If you come in this lot I will kill you."     They further state that when deceased was shot he turned and started through the lot gate towards his home and fell somewhere between the lot and his residence, and that he carried the stick with him until he fell; that Pel and Wayne Herring followed their brother (the deceased), Pel

still carrying the hoe. There is evidence also on the part of the defense that the deceased got the stick at the barn; that it was the stick described above and had been used on a cow and so fastened as to prevent her from sucking herself. It is further testified for the defense that after deceased picked up the stick he never threw it down any more until after he was shot, and that he dropped it when he fell after being shot. The wife of the deceased and sister of appellant testified that she was in her house in the room with her mother-in-law and that she looked out of the window and saw the smoke of the pistol; that at this point she saw her father and brother and her husband; that about the time the firing ceased she saw her husband running towards their residence with a large stick in his hand; that she did not wait to see deceased fall, but turned to her mother-in-law, and said, "They are having a racket out there." That thereupon her mother-in-law went out of the building on the opposite side from where the shooting occurred, saying that she would go and bring her boys to the house. Mrs. J. M. Gant (mother of appellant) testified that she heard the shots from her house, which was in sight of the lot; that she heard the report of the pistol and saw the smoke, and Lige Herring retreating, but as there were some obstacles in her way she could not see anything but the upper part of his body, nor could she see what he had in his hand. There is considerable testimony pro and con as to whether deceased had the stick in his hand at the time he was shot or not. The State's theory being that the stick was placed near the body after he fell. The testimony for the defense shows that he had the stick in his hand at the time he was shot as well as prior thereto and retained possession of it until he fell. All the testimony shows that the stick was right at the body in a few inches of deceased's right hand, and that a hoe was found a few feet from the body of the deceased. There is testimony also from witnesses to the effect that the deceased had threatened to take the life of appellant and his, deceased's, father-in-law. The jury returned a verdict of murder in the second degree, giving appellant thirty years confinement in the penitentiary. There is evidence tending to show murder, manslaughter and self-defense; appellant's contention being, which he sustained by his evidence, that he shot in defense of his life by reason of the threatened attack upon him by the deceased with the stick above described, re-enforced by his two brothers, Pel and Harle Herring, one of whom had a hoe approaching him in a threatening manner and making threats against his life. This, perhaps, is a sufficient statement of the case to review the questions presented.

1. The first question for review is, that after six of the jurors had been empaneled and sworn, they were permitted to separate. In this connection it is shown that this separation was by agreement of appellant. Without going into a statement in respect to

these matters, it may be stated that the jury separated with the consent of the appellant, and that he further agreed that they might separate unaccompanied by an officer. The facts further show that this was done rather at the request of the court—that is, the appellant was asked, in the presence of the six jurors, if he was willing for them to separate and go home without being in charge of an officer. Appellant agreed to this, but turned to his counsel and remarked, "That does not look right." His counsel said, "What else can you do?" There seems to be no contradiction as to the manner of separation and what occurred at the time. This was error. Article 680, Code Criminal Procedure, is as follows: "The court may adjourn persons summoned as jurors in a capital case to any day of the term, but when jurors have been sworn in a case, those who have been so sworn shall be kept together and not permitted to separate until a verdict has been rendered, or the jury finally discharged, unless by permission of the court, with the consent of the State and the defendant, and in charge of an officer." Also, article 725 of the Code of Criminal Procedure, thus reads: "After the jury has been sworn and empaneled to try any case of felony, they shall not be permitted to separate until they have returned a verdict, unless by permission of the court, with the consent of the attorney representing the State, and the defendant, and in charge of an officer." In McCampbell v. State, 37 Texas Crim. Rep., 607, it was held that, while by express provision of article 22 of the Code of Criminal Procedure, a defendant in a criminal case may waive any right secured him by the law, except the right of trial by jury in a felony case, still he can not agree to the separation of the jury in such case without the jury being in charge of an officer; he can not, by his waiver, do that which the statute emphatically prohibits. It has also been held, construing this statute, that when the separation of the jury occurs by the consent of the accused, every juror shall be under the protection and control of an officer so that no communication may be had with any person in any way touching the cause on trial. Brown v. State, 38 Texas, 482; Porter v. State, 1 Texas Crim. App., 394; Grissom v. State, 4 Texas Crim. App., 374; English v. State, 28 Texas Crim. App., 500; Wright v. State, 17 Texas Crim. App., 152; Robinson v. State, 30 Texas Crim. App., 459; Early v. State, 1 Texas Crim. App., 248; Neal v. State, 50 Texas Crim. Rep., 583.

2. The misconduct of the jury is urged for reversal. During the trial, the jury were taken to an open air theater, and the evidence in regard to this matter rather pertinently shows that they were seated and mingled with the audience attending the theater, and that they were accessible to any person who may have desired to approach them. Without deciding whether this would be reversible

error or not, we desire to say that this character of conduct should not be permitted in the trial of cases. There is rather a strong intimation in the record that visiting the theaters by jurors had become a sort of a custom and habit during the trial of cases. This ought not to be done. This character of conduct on the part of jurors has been criticised in quite a number of decisions.

3. When the wife of deceased, who was the sister of appellant, was testifying, she was asked by appellant, the following question: "Did you or not ever hear any threats made by the deceased, Lige Herring, your husband, in regard to his intention to kill Will Gant, the defendant, and his father, J. M. Gant?" Objection by the State was urged to this question and the answer thereto, on the ground that any communication between the husband and wife could not be introduced in evidence because the statute, article 774, Code Criminal Procedure, prohibited it. The witness would have testified in the affirmative. Appellant contends this was not a privileged communication, such as is prohibited by the statute. We are referred to article 774 of the Code of Criminal Procedure and Cole v. State, 51 Texas Crim. Rep., 89. The statute referred to prohibits the introduction of confidential communications between husband and wife when either or both of them are used as witnesses. Cole's case referred to, does not support appellant's contention. An inspection of that case discloses that the matter testified to by Mrs. Cole was in regard to communications and statements made by Mrs. Cole to her father in the presence of Cole. That case further discloses that there was a meeting between Hudson, deceased, father-in-law of Cole, and Cole and his wife to talk over matters of trouble existing between Cole and his wife and Cole and his father-in-law, Hudson. During the conversation between the three, Mrs. Cole made statements of matters occurring between herself and her husband. On the witness stand she was permitted to testify in regard to this conversation and statements made during the interview. It was held in that case that these matters were not within the statute. We have no such state of case here. The bill of exceptions discloses that if the threats were made by the deceased against the father and brother of his wife, they were made when they were alone and not in the presence of others. It is unnecessary to further review the Cole case. It is not authority here and does not present the same question. The authorities are very clear, so far as we have been able to discover, that usually communications from the husband to the wife in the presence of others are not privileged. In support of this we might cite Gannon v. Peo., 127 Ill., 507; Fay v. Guynon, 131 Mass., 31; Allison v. Barrow, 91 Am. Dec., 291; State v. Gray, 55 Kan., 135.

It has also been held, so far as we have been able to examine the question, that a conversation between the husband and wife might be testified to by a concealed listener who overheard it, or by

any one who should overhear such conversation. Rex v. Simons, 6 Car. & P., 540; Lyon v. Prouty, 154 Mass., 488; Com. v. Griffin, 110 Mass., 181; People v. Hayes, 140 N. Y., 484; Wheeler v. Campbell, 68 Vt., 98; State v. Center, 35 Vt., 378; Knight v. State, 114 Ga., 48. In the last cited case it was said: "If they are unsuccessful in keeping secret that which they intended each other shall so regard, the mere fact that they did so intend will not render incompetent the testimony of an outsider." See also Wilkerson v. State, 91 Ga., 729; Nolen v. Harden, 43 Ark., 307; 6 Enc. of Evidence, p. 906-7, and notes in which authorities are collated. The bill of exceptions is based on the idea that the threats when made, were made to the wife not in the presence of others. She, therefore, would not be permitted to testify to these communications. See Code Criminal Procedure, article 774. In point see Davis v. State, 45 Texas Crim. Rep., 292; Williams v. State, 40 Texas Crim. Rep., 497, 565.

The privilege extends beyond dissolution of marital relations by death or divorce. Ency. Ev., p. 196, 197, note 43 for collation of authorities. It includes letters from one spouse to the other. Mitchell v. Mitchell, 80 Texas, 101. See also Mercer v. State, 40 Fla., 216; 53 Mo. App., 418; 29 Am. St. Rep., 414, note; Stein v. Bowman, 13 Peters, 209; 5 Ala., 224; 1 Greenleaf Ev., 254, 337, 338, and notes. Cook v. Grange, 18 Ohio, 526, 531; Brown v. Wood, 121 Mass., 137; Maynard v. Vinton, 59 Mich., 139; Jacobs v. Hesler, 113 Mass., 157; Hitchcock v. Moore, 70 Mich., 112; Smith v. Potter, 27 Vt., 304; Brock v. Brock, 9 At. Rep., 486.

4. The State was permitted, over the objection of appellant, to prove by Mrs. Lettie Herring, mother of the deceased, that just as deceased was leaving his residence that evening en route to the barn where the tragedy occurred, he told her to hurry up supper so they could make ice cream after supper. We are of opinion this testimony was admissible under the authority of Brumley v. State, 21 Texas Crim. App., 222; Johnson v. State, 22 Texas Crim. App., 206, and quite a lot of other decisions of this court.

5. Quite a number of exceptions are reserved to the charge of the court, some of which, we are of opinion, are well taken. In regard to the charge on manslaughter, the court presented it in a general way to the effect that any state or condition of circumstances which would render the mind incapable of cool reflection if followed by sudden passion, would reduce it to manslaughter. Then follows a closer application of the law in which the court singled out the one fact of the deceased inviting appellant out of the barn to fight and appellant going out, or qualifyingly accepting the challenge. It is contended that the court by selecting this one isolated circumstance in the case, submitted the issue of manslaughter upon false theories, or, at least, a misleading idea. We are of

opinion that this contention is correct. An inspection of the record shows that this was a very seriously controverted question, and it is further shown that the deceased went out of the gate to get his hat, retaining the large stick, and when appellant went to the gate to shut it, deceased approached it in a threatening manner with the purpose in view of striking appellant with the bludgeon, and that appellant ordered him to stop two or three times and retreated; that the two brothers of deceased were approaching—one armed with a hoe, and the other was reaching to the ground as if to get a rock or some instrument. Appellant's testimony further goes to eliminate any question of challenge or acceptance of challenge. Where a court undertakes to select and cull facts from the record and specifically point them out in a charge and submit them as a basis for manslaughter, as in this case, sufficient of the facts should be stated so as to present fully and fairly the issue of manslaughter from any standpoint made by the facts, or deducible from the testimony. The evidence discloses that there might be several matters of fact presenting the issue of manslaughter besides the single one of the appellant going out in accordance with the invitation of the deceased to fight him.

6. It is also urged that the charge is wrong in not submitting the issue of manslaughter and self-defense both from the standpoint of three assailants, or, at least, more assailants than the deceased. We are of opinion that this contention of appellant is correct. All the evidence shows that two of the brothers of the deceased were approaching the scene of the difficulty at the time of the homicide. The evidence of appellant is, to the effect that one of them was armed with a hoe and that brother was threatening to cut off the head of appellant; that the other brother was reaching to the ground for some instrument to use and was threatening the life of both appellant and his father. The theory of self-defense as well as manslaughter was submitted only from the standpoint of aggression on the part of the deceased. We are of opinion that the evidence sufficiently brings the two brothers of the deceased in close enough proximity to require the court to submit the law applicable to manslaughter and self-defense from these standpoints.

7. The charge in regard to threats was rather vague and indefinite. Upon another trial it will be well enough in submitting this phase of the law to give a clear and pertinent statement of it to the jury.

8. Error is also urged against the charge in that portion of it in which the court instructed the jury, that appellant's right of self-defense would be in no way compromised or abridged by the fact that he armed himself with a pistol and went to the barn to demand an explanation in regard to his mail or any other lawful purpose. It is contended that this charge is too restrictive and places appellant's right to go to the barn upon too narrow a plane

and upon a false basis.  Unquestionably appellant had the right to go to the barn to attend to his stock or for any other purpose he saw proper, except in this case, to bring on a difficulty with the deceased, and in fact it would make no difference what his purpose was in going to the barn unless he did some act or uttered some word or did something that provoked the difficulty with the deceased, or that he thereby intended to provoke a difficulty with him.  The mere fact that he went to the barn with an unlawful purpose would not make him guilty, unless that purpose was accompanied by some act or word that brought about the difficulty or induced the deceased to engage in a difficulty.  Unlawful intent is not sufficient, unless accompanied by some act or word which provoked the difficulty.

For the errors indicated the judgment is reversed and the cause is remanded.

*Reversed and remanded.*