## WILL WHEELER v. THE STATE.

### No. 3915.  Decided June 17, 1908.

**1.—Murder—Insufficiency of Evidence—Death Penalty.**

Where upon trial for murder the evidence showed that when the deceased and the defendant were first seen they were engaged in a deadly conflict, and it was not shown by the prosecution how the difficulty originated, and there was evidence on part of the defendant that at the inception of the trouble, deceased had made an attack upon him with a knife, the verdict of murder in the first degree assessing the death penalty was not warranted.

**2.—Same—Charge of Court—Singling Out Facts—Manslaughter—Adequate Cause.**

Where upon trial for murder the court in his charge on adequate cause singled out two facts upon which to predicate adequate cause instead of placing all of them in connection with those stated in the evidence, the same was improper.

Appeal from the Criminal District Court of Dallas. Tried below before the Hon. W. W. Nelms.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

No brief on file for appellant.

*F. J. McCord,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was given the death penalty under a charge of murder of George Reed.

The evidence, in substance, shows that appellant and deceased boarded at the house of one Rosa Griffin and were rivals for her favors. Some of the witnesses describe deceased as having "a brown skin and yellow eyes"; that he played a guitar at night and slept in the day time. Appellant was an employee of the M. K. & T. Ry. Co. and worked in the day and slept at night. The partiality of the deceased and appellant for Rosa Griffin seems to have led to the fight, which ended in this homicide, the deceased thinking that appellant had the better of the love affair, or at least to some extent had supplanted him in the affec-

tions of Rosa Griffin. None of the witnesses for the State saw the beginning of the difficulty. The first witness for the State, Amanda Brown, says, she lives in the next house to that occupied by Rosa Griffin where appellant and deceased were boarding. She heard a disturbance, and looking up saw George Reed, the deceased, who was stumbling over a furnace sitting in the door. This furnace was used in which to place irons when they were used by the washer-woman. There was no fence between the places, and the yard where she was standing was used in common. When deceased reached the door appellant put his hands on both sides of the door and leaped out over deceased and grabbed him and cut him with a knife. Deceased was in front as they came out of the door. This witness could not say what was in the hands of either, but said that appellant was hitting deceased "in the back when he was down there that way coming out of the door." That she noticed where deceased had been cut on the jaw. She testifies to seeing only one stab. That when deceased fell two women run to him and turned him over. There was blood on the ground where deceased lay. The witness describes it as if a hog had been stabbed. Appellant, when deceased fell, looked at his hand, walked off, jumped over the fence and went up the Katy railroad. Appellant lived in a little shed room out on the side of the house in front. Rosa Griffin lived in front of the house. She locates these parties definitely in their difficulty as coming out of the back door of the hall of the front house. Martha Coleman testified that she saw appellant and deceased on the front porch. She was sitting in the front room of her house sewing, heard a noise, looked out of the window and saw the parties down on the porch scuffling. This was on front of the front porch. She said, "O, they are fighting at last," and holloed to some one to come there, and screamed, but nobody would come. She states in regard to the difficulty from the time she first saw the stabbing until the last stab, deceased was not doing anything but trying to keep appellant off of him. She did not hear a word said between them. When she first saw the parties they were down on the porch on their knees, and it looked like they were trying to get up. She did not see them before they were down on their knees on the porch. She says that the knife that she saw looked bright. She saw nothing in the hands of deceased. There was blood on the front porch, and through the hall, and at the back door, and in the back yard where deceased fell. She did not know where the fight began, and did not go into any of the rooms to ascertain. They were already fighting when she first saw them, one man cutting the other. Mattie Stanton testified that when she first saw the parties they were outside of the house at the cistern. Did not know exactly how far they were from the house. Rosa Griffin, the proprietress of the house where the homicide occurred, had known appellant for eight months, and knew the deceased. She did not see any of the difficulty until about its termination. When she arrived on the scene appellant had deceased in the collar and they were up against the cistern and appellant was cutting him. She did not know how many

times he was cut. After deceased fell appellant looked at him a moment, jumped over the fence and went away. She left home that morning about nine o'clock and did not know where deceased was at that time; did not see him about the place, nor did she know where appellant was; saw neither of them. Appellant had been there that morning; she had seen deceased about seven o'clock; that when she went away to make a purchase of some eggs, deceased was getting on the car to go to Oak Cliff, and she saw nothing more of him until about the termination of the difficulty. Appellant had lived at her house about six weeks, and deceased two weeks longer. The witness James testified that as deputy sheriff he arrested appellant in the river bottom in the evening after the homicide in the morning; that he had no knife. That when he found appellant he had a cut on his right hand in the edge of the palm just below the knuckle joint of the little finger; that it looked like a knife cut. That it was a wide open gash about an inch long and pretty deep. "This cut was in the palm of the right hand." Appellant testified that he killed deceased. That he was 27 years of age, and weighed 149 pounds at the time of the homicide, and was working on the Katy railroad, and had been so working since April previous to the homicide; that he moved to Rosa Griffin's on the first day of April. The deceased began staying there subsequently. That he usually went to his work about seven o'clock in the morning; that deceased stayed there in the day time, and that the trouble began about Rosa Griffin. That deceased ordered him to leave the premises that morning, and stated that he was going to see that he (appellant) did leave; that deceased came from town and followed him from the car down to the saloon and told him he had to leave there and "I says, 'what right have you got to make me leave from around this house, where I have been paying room rent and board bill?' and he says, 'I will show you that you have got to leave there' and he steps out from the front room out on the gallery and asked me to give him a chew of tobacco and I never gives him the tobacco, and I says, 'What right have you got to come out here and ask me for a chew of tobacco?' and he says, 'I want to see you' and he comes out and he says 'Let me have your knife' and I says, 'Haven't you got one?' and I didn't have no knife and he pulls his knife out of his pocket and grabs me by the arm and holds me there and hit me here and here (indicating his shoulder and forearm) before I could do anything. And I says, 'You have got me bested, and you can carry me anywhere you want to, and he carries me back in the room; and he cut me here (indicating the right breast) and he cut me here in the hand, and then I stopped and threw my hand up against the hall room there and he pulls me back to this room, and I shoved him and when I shoved him I stepped on this knife, and I picked it up, and when I did that he started for this axe, and when he starts for this axe I cut him and I dashed him up against the side of the house and I caught hold of him, and he reached in his pocket, and I cut him, and the second time I let him down. I think this must have been his knife. Mine was on

the table. I did not get to it at all; he did not give me time, for I was busy fighting. I was in Rosa's room when he came there. Rosa had gone to her work. When I saw the knife in his hand I was scared and didn't know what to do. I tried to get out of the way and started to run, till he grabbed me in the collar here and told me to go. He was a whole lot larger than I am and taller and heavier built."

Without going further into the details of the testimony of appellant, the substance of it all is that the trouble began between them in the room about the woman, when deceased ordered him to leave the premises; that deceased got out his knife and cut appellant two or three times, including that on the hand described by the deputy sheriff, James. That in their scuffle they seemed to have gotten out on the front porch, then through the hall way to the back porch, and finally in the back yard, or at least near a cistern if it was in the back yard. There the trouble ended in the death of the deceased. No witness saw the beginning of this difficulty except appellant. Every witness testifying for the State shows a want of knowledge of the origin of the difficulty. The first thing that any of them saw in regard to it was on the gallery when they were fighting. When the State's witness saw the difficulty appellant was using the knife stabbing deceased. So, from the State's standpoint we have a deadly conflict going on between the parties which continued until it ended in the death of one of them. On the part of the defendant we have a deadly conflict going on between himself and the deceased, beginning in a room by an attack on himself by the deceased with a knife which he finally succeeded in getting and with which he killed his assailant. We have him also, under his testimony, with three or four wounds inflicted by the deceased. None of these wounds, however, are testified about except by appellant, except that on the hand. The knife was not produced at the trial and no witnesses seems to have ever seen it, except one testified that she saw what she thought was a knife in the hand of appellant and that it had a bright looking blade. This was while the difficulty was in progress. One or more of the State's witnesses were under the impression that appellant threw the knife down in the yard when the difficulty was over and at the time he left. Appellant testified also at the termination of the difficulty he threw the knife down and left, going over the back fence. This case has some singular phases to it in that no witness testified to the number of stabs or wounds or where they were, except the one on the jaw, which appellant indicates was accidental and done during the scuffle over the knife deceased had in his hand; that during the fight over the knife the blade of it was raked across the face of deceased, while he was trying to prevent deceased using it on him and while trying to take it from him. None of the witnesses saw any wound other than that on the jaw of deceased, and no witness testified to any number of wounds except appellant, who said he stabbed deceased twice, may be three times. That he only stabbed him in front, not in the back. So we have a case made by the State, of two parties engaged in a deadly conflict when they were first seen by State

witnesses without any attempt on the part of the prosecution to show the origin or reason for the difficulty. This state of facts would not justify a conviction of murder in the first degree. An unexplained killing could not rise above the dignity of murder in the second degree. No express malice is shown on the part of the State's evidence. Appellant's testimony shows that at the inception of the trouble deceased had made an attack on him with a knife; had cut him three times before he succeeded in taking the knife from him; that they scuffled through the hall way, deceased trying to reach an axe in the back yard which he says was there and which deceased said he intended to get and use on him to his death. One or more of the State's witnesses denied that the axe was in the back yard; one of them stating her son had taken the axe away to cut some kindling wood. Under no theory suggested by this evidence is there murder of the first degree. A fact might be mentioned in this connection that we have overlooked to the effect that appellant stated that he was struck by deceased with a chair and knocked down before deceased pulled his knife.

After giving a general charge on manslaughter, adequate cause and sudden passion, the jury were further instructed that they could look to all the facts and circumstances in determining whether appellant's mind was incapable of cool reflection, etc. After doing so, this charge was then given: "If you believe from the evidence beyond a reasonable doubt, that the defendant did unlawfully cut and stab with a knife and thereby killed the deceased, as charged in the indictment, but you further believe that at the time of or just prior to such killing the deceased ordered the defendant to leave the house and struck defendant with a chair and displayed a knife in a threatening manner or did either of such acts, and that such action on the part of deceased, aroused in the mind of the defendant such a degree of anger, rage, sudden resentment or terror as to render the mind of the defendant incapable of cool reflection, and acting under the influence of such passion so aroused, and not in defense of himself from an unlawful attack producing in the mind of defendant a rational expectation or fear of death or serious bodily injury, did cut and stab and thereby killed George Reed, or in case you have a reasonable doubt as to this, you cannot convict the defendant of a higher offense than manslaughter." Several objections are urged to this charge, which we believe are well taken. This charge singled out two facts: First, that appellant was struck with a chair by the deceased, and, second, displaying a knife in a threatening manner. This may have and doubtless did impress the jury with the idea that the court thought that these were the only circumstances in the case to be considered by them as capable of arousing sudden passion, rendering his mind incapable of cool reflection. The evidence shows that deceased struck appellant with a chair, and not only displayed his knife in a threatening manner, but actually assaulted appellant with a knife, cutting him in three places, none of which seem to have inflicted serious bodily injury, but producing pain and bloodshed. It is furthermore in

evidence that the conflict or engagement between them was of a very serious nature in deceased trying to use the knife and appellant trying to avoid it until he secured the knife, disarming his antagonist. As the court selected facts upon which to predicate adequate cause and sudden passion, he should have placed all of them in connection with those stated, because the jury may have been and doubtless were impressed with the idea that the court either did not believe the testimony of appellant, or thought these were the only facts justifying a charge on manslaughter. Upon another trial this should be avoided, as the charge as given is erroneous.

There is another question in the case, discussion of which is pretermitted as it will be disposed of in another case or other cases, to wit: the validity of the Act of the Legislature in regard to the manner of drawing, summoning and empaneling grand and petit juries.

As the record is presented to us, we are of opinion the court's charge in regard to manslaughter is erroneous, and the evidence does not sustain murder in the first degree, and the death penalty was illegally awarded.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*