### W. R. HASSELL v. THE STATE.

No. 4161.   Decided October 11, 1916.

**1.—Murder—Self-defense—Landlord and Tenant—Charge of Court—Reasonable Doubt.**

Where the homicide grew out of a dispute over a crop between landlord and tenant, defendant being the tenant and deceased the landlord, and the State contended that the defendant had turned his cotton crop over to the deceased, and that defendant could not claim to have acted in defense of his property, and defendant contended that he had not turned over said crop to the deceased, and had a right to act in defense of his property when he shot and killed deceased, it was reversible error in the court's charge to require defendant to prove that he had not turned the cotton crop over to deceased, before he would have the right of defending his property, as defendant was entitled to the reasonable doubt upon this issue.

**2.—Same—Defense of Property—Statutes Construed.**

Article 1107, Penal Code, provides that one who acts in defense of his property must resort to all other means then at his command to prevent the injury, before resorting to the extreme of killing the assailant. However, this does not refer to a right to go and sue the aggressor, and the court, in the instant case, should so have instructed the jury; but the contention that this restriction on the right to defend one's property is untenable, can not be sustained.

**3.—Same—Adequate Cause—Manslaughter—Charge of Court.**

Where, upon trial of murder, the defendant complained that the court below, in his charge on manslaughter, had undertaken to state a part of the facts

instead of embracing all of the facts and circumstances, which would amount to adequate cause and reduce the homicide to manslaughter, and, it appeared from the record that this contention was correct, the same was reversible error. Following Wheeler v. State, 54 Texas Crim. Rep., 47, and other cases.

**4.—Same—Rule Stated—Adequate Cause—Facts and Circumstances—Charge of Court.**

Where, upon trial of murder, the court charged the jury that they might look to all the facts and circumstances that had occurred between deceased and defendant, and as a general rule, this would be sufficient to direct the minds of the jury, yet in this case, very nearly all the prior incidents and discussion had taken place between defendant's father and deceased, and the charge of the court would exclude the jury from considering such matter, when under the peculiar circumstances of this case, they should have been authorized to consider such facts and incidents, the same was reversible error.

**5.—Same—Self-defense—Threats—Charge of Court.**

Where, upon trial of murder, the charge of the court placed an improper limitation on defendant's claim of self-defense, and only authorized the jury to consider the threats against defendant's life, when the record showed threats, not only against defendant's life but also against the life of his father, and disclosed acts and words to lead the defendant to believe that deceased was a dangerous man, etc., said charge of the court was too restricted, and perhaps, misled the jury in passing on both the issues of manslaughter and self-defense.

**6.—Same—Name of Deceased—Middle Initial—Variance.**

Where the indictment charged the defendant with killing E. B. Holcomb, while the evidence showed the name of the deceased to be E. J. Holcomb, there was no variance, as the middle initial of the name of the deceased can be wholly disregarded. Following Stockton v. State, 25 Texas, 772.

**7.—Same—Evidence—Photograph.**

Unless the evidence should show that the conditions are practically the same at the time of taking the photograph that they were at the time of the homicide, a photograph of the scene of the homicide, is inadmissible in evidence.

Appeal from the District Court of Navarro. Tried below before the Hon. H. B. Daviss.

Appeal from a conviction of murder; penalty, fifteen years imprisonment in the penitentiary.

The opinion states the case.

*Richard Mays* and *Callicutt & Johnson,* for appellant.—On question of variance in name of deceased: Luttrell v. State, 143 S. W. Rep., 628; Stewart v. State, 19 S. W. Rep., 908; Hardin v. State, 26 Texas, 113; Jones v. State, 62 Texas Crim. Rep., 637.

On question of court's charge on self-defense and manslaughter: Weaver v. State, 76 S. W. Rep., 564.

On question of court's charge on self-defense and threats: Gonzales v. State, 12 S. W. Rep., 733; Swain v. State, 86 S. W. Rep., 335; Barnes v. State, 133 S. W. Rep., 887; Lundy v. State, 127 S. W. Rep., 1032; Williams v. State, 136 S. W. Rep., 771; Walker v. State, 156 S. W. Rep., 206; Pryse v. State, 113 S. W. Rep., 938.

On question of limiting right to protect property: Woodring v. State, 30 S. W. Rep., 1060; McGlothlin v. State, 53 S. W. Rep., 869.

On question of court's charge on manslaughter: Gant v. State, 55 Texas Crim. Rep., 284, and cases cited in opinion.

*C. C. McDonald,* Assistant Attorney General, for the State.—On question of defending property: Callicoatte v. State, 22 S. W. Rep., 1041; Hopkins v. State, 53 id., 619; McGlothlin v. State, 53 id., 869; Gay v. State, 58 Texas Crim. Rep., 472; Carr v. State, 41 id., 380; Fifer v. State, 64 id., 203.

On question of variance of name of deceased: Luttrell v. State, 143 S. W. Rep., 628; Stewart v. State, 31 Texas Crim. Rep., 153, and cases cited in opinion.

HARPER, JUDGE.—Appellant was convicted of murder and his punishment assessed at fifteen years confinement in the State penitentiary.

The record is quite voluminous, appellant's motion for a new trial alone embracing sixty-eight pages of the transcript, presenting numerous questions for review, and many of the same questions from different viewpoints. We have carefully read the entire transcript and the briefs of counsel for the State and appellant. Neither of the briefs take up the various grounds presented, but rather discuss several grounds under one assignment, and we shall also do so in disposing of the case.

The main contentions of the appellant in his brief relate to claimed errors in the court's charge presenting the issues of manslaughter and self-defense, he contending that the charge .does not present those issues as applicable to the facts in evidence.

In 1913 E. J. Holcomb owned a farm in Navarro County. J. P. Hassell was a widower—the father of three boys: W. R. Hassell, appellant, a married man; Hugo Hassell, a fourteen-year-old boy, and Ben Hassell, a young man about twenty-three years old. In the fall of 1913 J. P. Hassell, referred to in the record as the "old man," and his grown unmarried son, Ben, were working for deceased, Holcomb, on his farm,—appellant and Hugo being at that time in Oklahoma. The old man and Ben and Holcomb made a tentative trade for the rental of one hundred acres of land for the year 1914, if appellant and Hugo would come from Oklahoma, so they could all live together. Appellant and Hugo returned to Texas, and the one hundred acres of land was rented from deceased. The State's contention is that the land was rented to appellant and Ben Hassell alone, while the contention of appellant is that the rental contract was with J. P. Hassell for the use of himself and all three of his sons. They all moved on the Holcomb farm, and lived together, Holcomb furnishing a lot of household articles and other things to appellant, for which he and Ben gave their note for $108. Ben purchased a horse and buggy from Holcomb, agreeing to give $185 therefor, and he and appellant gave a joint note to Holcomb for $300, securing it by a mortgage on the crop. Neither J. P. Hassell nor Hugo signed either the note or the mortgage. About March 1st the landlord hired Ben Hassell to work

for him, and he was no longer interested in the crop or the rental contract, the landlord reducing the land from one hundred acres to seventy acres. All of this was planted in cotton, except about one acre planted in oats, and this acre was planted in cotton when the oats were harvested. The land was worked by appellant, J. P. and Hugo Hassell, and no friction or trouble arose until some nine bales of the cotton had been picked and ginned. The groceries during the year were purchased from A. F. Toal, and were charged to W. R. Hassell alone, secured by the landlord. This debt amounted to about three hundred dollars.

The landlord, Holcomb, purchased a span of mules from Berry and Martin, giving his note for $330, and securing it by giving a mortgage on the mules, also giving to Berry and Martin as collateral the $300 note of appellant and Ben Hassell.

, As the crop was gathered it was hauled to the gin and ginned and weighed in the name of J. P. Hassell and sons, the receipts for the cotton being placed in the First State Bank of Dawson. The Hassells all testify the cotton was placed in the bank to await an advance in the price of cotton, that being the year the price of cotton was very low. Holcomb is dead and we can get only his contention by the circumstances. The bankers say as fast as the receipts were placed in the bank they were pinned to the $330 note of Holcomb due to Berry and Martin, and to which note wat attached the $300 note of W. R. and Ben Hassell.

Toal, the merchant furnishing the supplies, approached the Hassells and offered ten cents a pound for the cotton, if applied to the debt due him. To this proposition the Hassells gave their assent, if the landlord would agree to it, but the landlord did not agree. He told Toal he would let him have one bale of the cotton if Berry, the holder of the $330 note, would consent. Berry refused to consent and none of the cotton was applied to the debt due Toal.

J. P. Hassell and Hugo Hassell each asserted a claim to one-third of the cotton, but were willing for it to be applied to the payment of the debt due Toal for supplies, but were unwilling for it to be applied to the $300 note of W. R. and Ben Hassell given to Holcomb for the horse and buggy purchased by Ben Hassell, and other things purchased by W. R. Hassell. Toal testifies when he approached W. R. Hassell about his debt he said he had turned the cotton crop over to the landlord to be applied to his debts, and for him to see Holcomb. This W. R. Hassell denies, but says he told Toal he was willing for the baled and ginned cotton to be sold to him at ten cents a pound to pay his, Toal's, debt, and to see the landlord in regard thereto. If J. P. Hassell and Hugo Hassell owned any part of the crop there is no evidence that they or either of them ever authorized the landlord to sell their part of the crop.

The most pleasant relations appear to have existed until the ginning of the ninth bale of cotton. The trouble then arose over the seed.

J. P. Hassell had hauled this bale of cotton to the gin, and he and the landlord each wanted the seed out of this bale of cotton. They had words, and this apparently is the first source of trouble. The money received for these seed was finally divided between the landlord and J. P. Hassell by agreement, but the bitterness engendered continued to exist. The next cause of friction seems to have been brought about by Holcomb going to the field and hauling out some twelve hundred pounds of seed cotton and selling it. The Hassells were then informed that Holcomb had also sold the nine bales of cotton placed in the bank. They went to the bank, and when they ascertained that Holcomb had sold the nine bales of cotton for 7½ cents per pound and applied the money to the note due by Ben Hassell and appellant, J. P. Hassell sought the advice of counsel, and Holcomb was notified that he must settle with J. P. Hassell and Hugo Hassell for their interest in the cotton or they would bring suit. All the threats and evidences of ill-will and unkind words up to this time in the record are shown to have been uttered by J. P. Hassell, the father, and Holcomb, the landlord. W. R. Hassell, appellant, is not shown to have made any unkind remarks, but was investigating the sale of the nine bales of cotton, the twelve hundred pounds of seed cotton, and the disposition of the money.

A portion of another bale of cotton had been picked in the Hassell field, and on the morning of the fatal difficulty Holcomb had gone to the field and was taking the cotton off the rented premises without saying anything to either of the Hassels, when appellant met him at the gate and the shooting occurred.

The State contends that appellant had turned his cotton crop over to deceased, and, therefore, deceased had a right to haul off the cotton and sell it, and that appellant could not claim to have acted in defense of his property. Appellant's contention is that he had not turned over his cotton crop to deceased; that deceased was taking it, selling it and appropriating the proceeds arising from such sales without warrant or authority and without accounting to him for the proceeds. Appellant complains of the court's charge, contending that it required him to prove that he had not turned the cotton over to the landlord before he would have the right to act in defense of his property. Paragraph 15 of the court's charge is subject to this construction, for it requires the jury to find as an affirmative fact that appellant was the owner of a portion of the cotton and entitled to possession before he would be authorized to act in defense of his property. The appellant instead of being required to prove this as an affirmative fact is entitled to the reasonable doubt on this issue as well as all other issues in the case. It is shown beyond doubt that the cotton in question was raised by appellant, his father and brother Hugo. This gave him possession in law, unless he had turned the cotton over to the landlord,—there being some evidence that he had done so. But on this issue the jury ought to have been required to find that he had done so beyond a reasonable doubt before his right of defense of property

would be taken from him. This issue being in the case, it ought to have been correctly presented to the jury and the jury told he would not have the right to defend his property if they found from the evidence beyond a reasonable doubt that appellant had turned his interest in the cotton over to deceased to dispose of to pay his, appellant's debts. On the other hand, they should have been told if they found appellant had not turned the cotton crop over to deceased, or they had a reason-able doubt as to whether he had done so or not, he would have the right to protect his possession of this property. Our statute provides (art. 1107) that one under such circumstances must resort to all other means then at command to prevent the injury before resorting to the extreme of killing the assailant. However, this does not refer to a right to go and sue the aggressor, and the court should so have instructed the jury that they would have known that means referred to were such as were then at his command. If appellant had not theretofore turned his cotton over to deceased, the fact that deceased had gone on rented premises and hitched his team to the wagon in which appellant had placed the cotton would not have ousted appellant's possession of the cotton so long as it was on the rented premises. The deceased was in the act of driving the cotton off the rented premises and in law would be in the very act of committing the unlawful deed, if he had not been given possession by appellant theretofore. The contention of appellant that the Legislature had no right to place such restriction on the right to defend one's property can not be sustained. To our minds it is a proper restriction, and one ought to be required to use all means at his command to prevent injury to his property or possession thereof before taking human life. In many jurisdictions this limitation is placed around the right to defend even one's own life, and while that is not the rule in this State, yet it is the rule in regard to defense of property and a salutary one, we think. (See citation of authorities under sec. 1919, art. 1107, Branch's Ann. Penal Code.) On another trial the court will so instruct the jury that they will know that appellant had the right to defend his possession of his property under the provisions of article 1107, unless they find beyond a reasonable doubt that he had theretofore surrendered possession of the cotton crop to deceased, but if they do find that possession of the crop had been voluntarily turned over to deceased, appellant would only have the right to defend his person against an attack or apparent effort to take his life or inflict on his person serious bodily injury.

Appellant also complains of the tenth paragraph of the court's charge in defining what would be adequate cause to reduce the offense to manslaughter. The facts appellant relies on to reduce the offense to manslaughter are that deceased had, without authority, sold nine bales of cotton, which he, or his father, brother and himself owned a half interest, and applied the proceeds to his own use and had sold the cotton for $7\frac{1}{2}$ cents per pound when appellant had been offered 10 cents per pound by Toal; that deceased had taken twelve hundred

pounds of seed cotton, without the consent of appellant, or his father and brother, and mixing it with some of his own, sold it, and was in the act of again taking about one thousand or twelve hundred pounds of seed cotton without the consent of appellant, his father or brother Hugo; that deceased had made threats, was going armed and that he had been informed that deceased was going to force them to leave, etc. Appellant's contention is that if the jury found that state of facts to exist, even if appellant saw deceased drive into the field after this last cotton, if the jury believed it aroused in him such a degree of anger, rage or resentment as to render him incapable of cool reflection, and that under such circumstances he borrowed a gun and when deceased was fixing to drive out of the field with the cotton, he shot him, when deceased was attempting to do him no personal injury, he would be guilty of no higher grade of offense than manslaughter. He complains that the court in his charge having undertaken to state a part of the facts, should have embraced all of the facts and circumstances, and in this connection he seems to be sustained by our decisions. (Wheeler v. State, 54 Texas Crim. Rep., 47; Cant v. State, 55 Texas Crim. Rep., 284; Barbee v. State, 58 Texas Crim. Rep., 129; Munos v. State, 58 Texas Crim. Rep., 147.) It is true that the charge instructs the jury that they might look to all the facts and circumstances that had occurred between *deceased* and *appellant*, and as a general rule this would be sufficient to direct the minds of the jury properly, yet in this case very nearly all the prior incidents and discussions about the cotton had taken place between appellant's father and deceased, and this charge would exclude the jury from considering such matters, when under the peculiar circumstances of this case, they should have been authorized to consider such facts and incidents, because the father and deceased had been dealing with what it was considered was the joint property of appellant and his *father,* and appellant apprised of all these matters, and such matters might have an effect on the condition of his mind at the time.

Of course, if appellant's mind was not rendered incapable of cool reflection, he would be guilty of murder if the jury found that deceased was guilty of no act at the time which led appellant to believe his life was in danger, and under the State's evidence such finding would be sustained, yet the appellant has the right to have his contention fairly given in charge to the jury, that the jury may determine which contention is the correct one

The same criticism is leveled at the charge on self-defense; that the charge places an improper limitation in that it only authorizes the jury to consider the threats against appellant's life, and that the charge authorized the jury to alone consider "all the acts and words of Holcomb, deceased, and view all and whatever had gone before between *defendant* and the said Holcomb," etc., when the record shows threats against not only the life of appellant but also threats against the life of his father, and discloses that the "acts and words" which would

irritate and alarm one and lead one to believe deceased was a dangerous man and in a dangerous mood, had occurred between deceased and appellant's father, all of which conduct appellant had been made aware of. The circumstances are so entwined that we think appellant's contention is correct in claiming that the charge was too restrictive, and perhaps misled the jury as to what they could and should consider in passing on both the issues of manslaughter and self-defense. If appellant had been made aware of the threats and the acts and conduct of deceased, one can readily understand how he might have believed his life was in danger, if in fact deceased, at the time of the difficulty, said: "I will settle with you with this," reaching for his hip pocket in which it is shown deceased had a Colt's revolver.

It may be that deceased, although armed, made no effort to draw the pistol, as contended by the State, and if he did not. do so, appellant would be guilty of murder or manslaughter, yet the jury should be correctly informed as to the law governing the facts in evidence that they might correctly determine the issues made by the testimony.

There are many criticisms of the charge on manslaughter and self-defense, and many special charges asked in regard to those issues, but we do not deem it necessary to further discuss them, for what we have already said will give a correct idea of how the jury should be instructed on another trial if the evidence is the same.

We do not think the court erred in refusing to instruct the jury to acquit because the indictment charged appellant with killing E. B. Holcomb while the evidence showed the name of deceased to be E. J. Holcomb. The fact there was an E. B. Holcomb and he was shown to be alive would not alter the rule that incorrectly stating the middle initial does not render an indictment invalid. Appellant was not misled, knew whom he was charged with slaying, and under such circumstances it was early decided in this State that the misstating of a middle initial might be wholly disregarded, unless the evidence should show that the person on trial was misled thereby. Stockton v. State, 25 Texas, 772.

Appellant complains of the admission in evidence of a photograph of the scene of the homicide, taken a year after the difficulty. Unless the evidence should show that the conditions are practically the same at the time of the taking of the photograph that they were at the time of the homicide, the photograph will not be admitted on another trial. If shown to be practically the same, as the court's qualification of the bill would indicate, the photograph is properly admissible.

We do not deem it necessary to discuss the various other questions presented, as in our opinion none of them present reversible error, other than those hereinbefore mentioned.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*